# DOLE, SECRETARY OF LABOR, ET AL. *v.* UNITED STEELWORKERS OF AMERICA ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 88–1434.   Argued November 6, 1989—Decided February 21, 1990

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 43.

*Jeffrey P. Minear* argued the cause for petitioners. With him on the briefs were *Acting Solicitor General Wallace, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Merrill, Leonard Schaitman,* and *Marleigh D. Dover.*

*Laurence Gold* argued the cause for respondents. With him on the brief for respondents United Steelworkers of America et al. were *George H. Cohen, Jeremiah A. Collins, David C. Vladeck, Alan B. Morrison,* and *Elihu I. Leifer. Maurice Baskin* filed a brief for respondents Associated Builders and Contractors, Inc., et al.*

JUSTICE BRENNAN delivered the opinion of the Court.

Among the regulatory tools available to Government agencies charged with protecting public health and safety are rules which require regulated entities to disclose information directly to employees, consumers, or others. Disclosure rules protect by providing access to information about what dangers exist and how these dangers can be avoided. Today we decide whether the Office of Management and Budget (OMB) has the authority under the Paperwork Reduction Act of 1980, 44 U. S. C. § 3501 *et seq.* (1982 ed. and Supp. V), to review such regulations.

I

In 1983, pursuant to the Occupational Safety and Health Act of 1970 (OSH Act), 84 Stat. 1590, 29 U. S. C. § 651 *et seq.* (1982 ed.), which authorizes the Department of Labor (DOL) to set health and safety standards for workplaces, DOL

---

*Briefs of *amici curiae* urging reversal were filed for the Business Council on the Reduction of Paperwork by *Clark R. Silcox;* for the National-American Wholesale Grocers' Association et al. by *Arthur Y. Tsien;* for the National Wholesale Druggists' Association by *Lawrence W. Bierlein;* and for Senator Lawton Chiles by *Daniel J. Popeo, Paul D. Kamenar,* and *Wayne Hartke.*

*Burton D. Fretz, Toby S. Edelman,* and *Edward F. Howard* filed a brief for the Action Alliance of Senior Citizens et al. as *amici curiae* urging affirmance.

promulgated a hazard communication standard. 29 CFR § 1910.1200 (1984). The standard imposed various requirements on manufacturers aimed at ensuring that their employees were informed of the potential hazards posed by chemicals found at their workplace. Specifically, the standard required chemical manufacturers to label containers of hazardous chemicals with appropriate warnings. "Downstream" manufacturers — commercial purchasers who used the chemicals in their manufacturing plants — were obliged to keep the original labels intact or else transfer the information onto any substitute containers. The standard also required chemical manufacturers to provide "material safety data sheets" to downstream manufacturers. The data sheets were to list the physical characteristics and hazards of each chemical, the symptoms caused by overexposure, and any pre-existing medical conditions aggravated by exposure. In addition, the data sheets were to recommend safety precautions and first aid and emergency procedures in case of overexposure and provide a source for additional information. Both chemical manufacturers and downstream manufacturers were required to make the data sheets available to their employees and to provide training on the dangers of the particular hazardous chemicals found at each workplace.

Respondent United Steelworkers of America, among others, challenged the standard in the Court of Appeals for the Third Circuit. That court held that the Occupational Safety and Health Administration (OSHA) had not adequately explained why the regulation was limited to the manufacturing sector, in view of the OSH Act's clear directive that, to the extent feasible, OSHA is to ensure that no employee suffers material impairment of health from toxic or other harmful agents. The court directed OSHA either to apply the hazard standard rules to workplaces in other sectors or to state reasons why such application would not be feasible. *United*

*Steelworkers of America* v. *Auchter,* 763 F. 2d 728, 739 (1985).

When DOL responded by initiating an entirely new rulemaking proceeding, the union and its copetitioners sought enforcement of the earlier order. The Third Circuit directed DOL, under threat of contempt, to publish in the Federal Register within 60 days either a hazard communication standard applicable to all workers covered by the OSH Act or a statement of reasons why such a standard was not feasible, on the basis of the existing record, as to each category of excluded workers. *United Steelworkers of America* v. *Pendergrass,* 819 F. 2d 1263, 1270 (1987).

DOL complied by issuing a revised hazard communication standard that applied to work sites in all sectors of the economy. See 52 Fed. Reg. 31852 (1987). At the same time, DOL submitted the standard to OMB for review of any paperwork requirements. After holding a public hearing, OMB approved all but three of its provisions. OMB rejected a requirement that employees who work at multiemployer sites (such as construction sites) be provided with data sheets describing the hazardous substances to which they were likely to be exposed, through the activities of any of the companies working at the same site. The provision permitted employers either to exchange data sheets and make them available at their home offices or to maintain all relevant data sheets at a central location on the work site. 29 CFR § 1910.1200(e)(2) (1988). OMB also disapproved a provision exempting consumer products used in the workplace in the same manner, and resulting in the same frequency and duration of exposure, as in normal consumer use. § 1910.1200(b)(6)(vii). Finally, OMB vetoed an exemption for drugs sold in solid, final form for direct administration to patients. § 1910.1200(b)(6)(viii). See 52 Fed. Reg. 46076 (1987).

OMB disapproved these provisions based on its determination that the requirements were not necessary to protect em-

ployees.[1]   OMB's objection to the exemptions was that they were too narrow, and that the standard, therefore, applied to situations in which disclosure did not benefit employees.[2] *Id.*, at 46077–46078.   DOL disagreed with OMB's assessment, but it published notice that the three provisions were withdrawn.   DOL added its reasons for believing that the provisions were necessary, proposed that they be retained, and invited public comment.   53 Fed. Reg. 29822 (1988).

The union and its copetitioners responded by filing a motion for further relief with the Third Circuit.   That court ordered DOL to reinstate the OMB-disapproved provisions. The court reasoned that the provisions represented good-faith compliance by DOL with the court's prior orders, that

---

[1] OMB concluded that workers on multiemployer sites would be adequately protected if each employer kept chemical manufacturers' labels intact, supplied data sheets to other employers on the site on request, and taught its own employees about the chemicals with which they worked directly and explained how to recognize hazards likely to be introduced by other employers.   52 Fed. Reg. 46077 (1987).

[2] The standard promulgated by OSHA had exempted, from any otherwise applicable labeling requirements, all food and drugs subject to the labeling requirements of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, as amended, 21 U. S. C. § 301 *et seq.* (1982 ed.), and all consumer products or hazardous substances subject to a consumer product safety standard or labeling requirements of the Consumer Product Safety Act, 86 Stat. 1207, as amended, 15 U. S. C. § 2051 *et seq.*, or the Federal Hazardous Substances Act, 74 Stat. 372, as amended, 15 U. S. C. § 1261 *et seq.*, or regulations issued under those Acts by the Consumer Product Safety Commission.   29 CFR §§ 1910.1200(b)(5)(ii), 1910.1200(b)(5)(iv) (1988).

OMB wanted OSHA to exempt, in addition, all products packaged in the same form and concentration as a consumer product, whether or not used for the same purpose or with the same exposure, as well as all Food and Drug Administration regulated drugs handled in the nonmanufacturing sector.   52 Fed. Reg. 46078 (1987).   OMB drew its recommended exemption for consumer products from § 311(e)(3) of the Superfund Amendments and Reauthorization Act of 1986, 100 Stat. 1615, 42 U. S. C. § 9601 *et seq.* (1982 ed., Supp. V), a provision aimed at informing the general public about chemicals that could cause hazardous conditions during an emergency situation.

OMB lacked authority under the Paperwork Reduction Act to disapprove the provisions, and that, therefore, DOL had no legitimate basis for withdrawing them. *United Steelworkers of America* v. *Pendergrass*, 855 F. 2d 108 (1988).

Petitioners sought review in this Court. We granted certiorari to answer the important question whether the Paperwork Reduction Act authorizes OMB to review and countermand agency regulations mandating disclosure by regulated entities directly to third parties. 490 U. S. 1064 (1989). We hold that the Paperwork Reduction Act does not give OMB that authority, and therefore affirm.

## II

The Paperwork Reduction Act was enacted in response to one of the less auspicious aspects of the enormous growth of our federal bureaucracy: its seemingly insatiable appetite for data. Outcries from small businesses, individuals, and state and local governments, that they were being buried under demands for paperwork, led Congress to institute controls.[3] Congress designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden. The Act charges OMB with developing uniform policies for efficient information processing, storage, and transmittal systems, both within and among agencies. OMB is directed to reduce federal collection of all information by set percentages, establish a Federal Information Locator System, and develop and implement procedures for guarding the privacy of those providing confidential information. See 44 U. S. C. §§ 3504, 3505, 3511 (1982 ed. and Supp. V).

The Act prohibits any federal agency from adopting regulations which impose paperwork requirements on the public unless the information is not available to the agency from another source within the Federal Government, and the agency

---

[3] See S. Rep. No. 96–930, pp. 3–4, 8 (1980) (S. Rep.); H. R. Rep. No. 96–835, pp. 3, 17 (1980) (H. R. Rep.).

must formulate a plan for tabulating the information in a useful manner. Agencies are also required to minimize the burden on the public to the extent practicable. See 44 U. S. C. § 3507(a)(1) (1982 ed. and Supp. V). In addition, the Act institutes a second layer of review by OMB for new paperwork requirements. After an agency has satisfied itself that an instrument for collecting information—termed an "information collection request"—is needed, the agency must submit the request to OMB for approval. See 44 U. S. C. § 3507(a)(2) (1982 ed., Supp. V). If OMB disapproves the request, the agency may not collect the information. See 44 U. S. C. § 3507(a)(3) (1982 ed.).

Typical information collection requests include tax forms, Medicare forms, financial loan applications, job applications, questionaires, compliance reports, and tax or business records. See S. Rep., at 3–4. These information requests share at least one characteristic: The information requested is provided to a federal agency, either directly or indirectly.[4] Agencies impose the requirements on private parties in order to generate information to be used by the agency in pursuing some other purpose. For instance, agencies use these information requests in gathering background on a particular subject to develop the expertise with which to devise or fine-tune appropriate regulations, amassing diffuse data for processing into useful statistical form, and monitoring business records and compliance reports for signs or proof of nonfeasance to determine when to initiate enforcement measures.

By contrast, disclosure rules do not result in information being made available for agency personnel to use. The promulgation of a disclosure rule is a final agency action that represents a substantive regulatory choice. An agency charged with protecting employees from hazardous chemicals has a

---

[4] Tax and business records are examples of information provided only indirectly to an agency. In these cases, the governing regulations do not require records to be sent to the agency; they require only that records be kept on hand for possible examination as part of a compliance review.

variety of regulatory weapons from which to choose: It can ban the chemical altogether; it can mandate specified safety measures, such as gloves or goggles; or it can require labels or other warnings alerting users to dangers and recommended precautions. An agency chooses to impose a warning requirement because it believes that such a requirement is the least intrusive measure that will sufficiently protect the public, not because the measure is a means of acquiring information useful in performing some other agency function.

No provision of the Act expressly declares whether Congress intended the Paperwork Reduction Act to apply to disclosure rules as well as information-gathering rules. The Act applies to "information collection requests" by a federal agency which are defined as

> "a written report form, application form, schedule, questionnaire, reporting or recordkeeping requirement, collection of information requirement, or other similar method calling for the collection of information." 44 U. S. C. § 3502(11) (1982 ed., Supp. V).

"Collection of information," in turn, is defined as

> "the obtaining or soliciting of facts or opinions by an agency through the use of written report forms, application forms, schedules, questionnaires, reporting or recordkeeping requirements, or other similar methods calling for either—
>
> "(A) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or
>
> "(B) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes." 44 U. S. C. § 3502(4) (1982 ed.).

Petitioners urge us to read the words "obtaining or soliciting of facts by an agency through . . . reporting or record-

keeping requirements" as encompassing disclosure rules. They contend that an agency is "soliciting facts" when it requires someone to communicate specified data to a third party and that the hazard communication standard's rules are "reporting and recordkeeping requirements" within the meaning of the Act because the employer is required to report hazard information to employees. Petitioners submit that the provisions requiring labeling and employee training are "reporting requirements" and that the provision requiring accessible data sheets containing health and safety information is a "recordkeeping requirement." We believe, however, that the language, structure, and purpose of the Paperwork Reduction Act reveal that petitioners' position is untenable because Congress did not intend the Act to encompass these or any other third-party disclosure rules.

"On a pure question of statutory construction, our first job is to try to determine congressional intent, using traditional tools of statutory construction." *NLRB* v. *Food and Commercial Workers*, 484 U. S. 112, 123 (1987). Our "starting point is the language of the statute," *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1, 5 (1985), but " 'in expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " *Massachusetts* v. *Morash*, 490 U. S. 107, 115 (1989), quoting *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 51 (1987). See also *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988) (same).

Petitioners' interpretation of "obtaining or soliciting facts by an agency through . . . reporting or recordkeeping requirements" is not the most natural reading of this language. The commonsense view of "obtaining or soliciting facts *by an agency*" is that the phrase refers to an agency's efforts to gather facts for its own use and that Congress used the word "solicit" in addition to the word "obtain" in order to cover information requests that rely on the voluntary cooperation of information suppliers as well as rules which make compliance

mandatory. Similarly, data sheets consisting of advisory material on health and safety do not fall within the normal meaning of "records," and a Government-imposed reporting requirement customarily requires reports to be made to the Government, not training and labels to be given to someone else altogether.

That a more limited reading of the phrase "reporting and recordkeeping requirements" was intended derives some further support from the words surrounding it. The traditional canon of construction, *noscitur a sociis*, dictates that "'words grouped in a list should be given related meaning.'" *Massachusetts* v. *Morash, supra,* at 114–115, quoting *Schreiber, supra,* at 8. The other examples listed in the definitions of "information collection request" and "collection of information" are forms for communicating information to the party requesting that information. If "reporting and recordkeeping requirements" is understood to be analogous to the examples surrounding it, the phrase would comprise only rules requiring information to be sent or made available to a federal agency, not disclosure rules.

The same conclusion is produced by a consideration of the object and structure of the Act as a whole. See *Offshore Logistics, Inc.* v. *Tallentire,* 477 U. S. 207, 220–221 (1986) (concluding that the meaning of a phrase was clarified by the language and purpose of the Act as a whole). Particularly useful is the provision detailing Congress' purposes in enacting the statute. The Act declares that its purposes are:

> "(1) to minimize the Federal paperwork burden for individuals, small businesses, State and local governments, and other persons;
>
> "(2) to minimize the cost *to the Federal Government* of collecting, maintaining, using, and disseminating information;
>
> "(3) to maximize the usefulness of information collected, maintained, and disseminated *by the Federal Government;*

"(4) to coordinate, integrate and, to the extent practicable and appropriate, make uniform Federal information policies and practices;

"(5) to ensure that automatic data processing, telecommunications, and other information technologies are acquired and used by the Federal Government in a manner which improves service delivery and program management, increases productivity, improves the quality of decisionmaking, reduces waste and fraud, and wherever practicable and appropriate, reduces the information processing burden for the Federal Government and *for persons who provide information to and for the Federal Government;* and

"(6) to ensure that the collection, maintenance, use and dissemination of information *by the Federal Government* is consistent with applicable laws relating to confidentiality, including . . . the Privacy Act." 44 U. S. C. § 3501 (1982 ed. and Supp. V) (emphasis added).

Disclosure rules present none of the problems Congress sought to solve through the Paperwork Reduction Act, and none of Congress' enumerated purposes would be served by subjecting disclosure rules to the provisions of the Act. The statute makes clear that the first purpose — avoiding a burden on private parties and state and local governments — refers to avoiding "the time, effort, or financial resources expended by persons to provide information *to a Federal agency.*" 44 U. S. C. § 3502(3) (1982 ed.) (defining "burden") (emphasis added). Because Congress expressed concern only for the burden imposed by requirements to provide information to a federal agency, and not for any burden imposed by requirements to provide information to a third party, OMB review of disclosure rules would not further this congressional aim.

Congress' second purpose — minimizing the Federal Government's cost of handling information — also would not be advanced by review of disclosure rules because such rules do not impose any information processing costs on the Federal

Government. Because the Federal Government is not the consumer of information "requested" by a disclosure rule nor an intermediary in its dissemination, OMB review of disclosure rules would not serve Congress' third, fourth, fifth, or sixth purposes. Thus, nothing in Congress' itemized and exhaustive textual description of its reasons for enacting this particular Act indicates any legislative purpose to have OMB screen proposed disclosure rules. We find this to be strong evidence that Congress did not intend the Act to authorize OMB review of such regulations.

This conclusion is buttressed by the language and import of other provisions of the Act. For instance, every federal agency is required to take three internal preliminary steps before adopting an information collection request. The agency must take action to

> "(A) eliminate, through the use of the Federal Information Locator System and other means, information collections which seek to obtain information available from another source within the Federal Government;
>
> "(B) reduce to the extent practicable and appropriate the burden on persons who will provide information *to the agency;* and
>
> "(C) formulate plans for tabulating the information in a manner which will enhance its usefulness to other agencies and to the public." 44 U. S. C. § 3507(a)(1) (1982 ed.) (emphasis added).

These requirements affect agencies only when they gather information for their own use. The first directs an agency not to ask for information that it can acquire from another agency.[5] The second requires an agency to consider the burden it places on the public, but only as to information provided *to the agency.* The third encourages an agency to

---

[5] See H. R. Rep., at 28 (the agency "is to eliminate any information collections which seek to obtain information available from other sources within the Federal Government").

make the information it has obtained useful to others as well. Significantly, no provision relates to disclosure rules. For example, no provision requires agencies to ensure that a paperwork requirement is effective or that its burden on one party is not disproportionate to the benefit afforded a third party.

Also instructive are the provisions governing OMB's review of proposed agency information collection requests that cast that review in terms applicable to information-gathering regulations but not to disclosure rules. OMB's examination is limited to "determining whether the collection of information *by an agency* is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility *for the agency*." 44 U. S. C. § 3504(c)(2) (1982 ed.) (emphasis added). "Practical utility" is defined in the statute as "the ability *of an agency* to use information it collects, particularly the capability to process such information in a timely and useful fashion." 44 U. S. C. § 3502(16) (1982 ed., Supp. V) (emphasis added).

However, in reviewing the disclosure rules at issue in this case, OMB was unable to consider what OSHA planned to do with information regarding hazardous chemicals at the various work sites, because OSHA was not to be the recipient of this information. Nothing was to be given to OSHA to process—in a timely fashion or otherwise. OMB instead disapproved the three OSHA rules on the ground that the mandated disclosures would be of little benefit *to the employees* OSHA sought to protect. But there is no indication in the Paperwork Reduction Act that OMB is authorized to determine the usefulness of agency-adopted warning requirements to those being warned. To the contrary, Congress focused exclusively on the utility of the information *to the agency*. And the only criteria specified are whether the agency can process the information quickly and use it in pursuit of its substantive mandate.

Yet a third provision reinforcing our conclusion that disclosure rules are not subject to the Paperwork Reduction Act is the statute's mechanism for assuring agency compliance with its terms. When OMB approves an information collection request, it issues a control number which is placed on all forms. If a request does not receive OMB approval, it is not issued a control number and the agency is prohibited from collecting the information. See 44 U. S. C. §§ 3504(c)(3)(A), 3507(f) (1982 ed.). In addition, if the agency nevertheless promulgates the paperwork requirement, members of the public may ignore it without risk of penalty. See 44 U. S. C. § 3512 (1982 ed.).[6] However, this protection of the public is applicable only to information-gathering rules. Section 3512 provides that "no person shall be subject to any penalty for failing to maintain or provide information *to any agency* if the information collection request involved . . . does not display a current control number assigned by the [OMB] . . . ." *Ibid.* (emphasis added).

While the grammar of this text can be faulted, its meaning is clear: the public is protected under the Paperwork Reduction Act from paperwork regulations not issued in compliance with the Act, only when those regulations dictate that a person maintain information *for an agency* or provide information *to an agency.* By its very terms, the statute's enforcement mechanism does not apply to rules which require disclosure to a third party rather than to a federal agency. Thus either Congress intended the Paperwork Reduction Act to cover information-gathering rules only, or Congress intended the Act to cover disclosure rules but intended to exempt them from this agency compliance mechanism. Because the latter is counterintuitive and contrary to clear legislative history,[7] § 3512 is further evidence that Congress did not intend the Act to cover disclosure rules.

---

[6] See *id.*, at 20 (The Act "allow[s] the public, by refusing to answer these [information collection requests], to help control 'outlaw forms'").

[7] See S. Rep., at 52–53 ("The only collections of information by a Federal agency which are exempted, and for which a person or persons could

## III

For the foregoing reasons, we find that the terms "collection of information" and "information collection request," when considered in light of the language and structure of the Act as a whole, refer solely to the collection of information by, or for the use of, a federal agency; they cannot reasonably be interpreted to cover rules mandating disclosure of information to a third party. In addition, we find unpersuasive petitioners' claims that there is a "clearly expressed legislative intention [to the] contrary," see *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 432, n. 12 (1987).

Petitioners rely on statements from various stages of the Act's legislative history as evidence that Congress intended "collection of information" to include disclosure rules.[8] However, the statements show merely that the Act was intended

not claim protection under section 3512, are those collections of information which this chapter does not apply to and are exempted by section 3518 [certain law enforcement and national security exceptions]"). See also H. R. Rep., at 30.

[8] See Report of Commission on Federal Paperwork, The Reports Clearance Process 1, 43 (Sept. 9, 1977) (explaining that the Federal Trade Commission did not interpret the Federal Reports Act of 1942, predecessor to the Paperwork Reduction Act, to apply to information it collected for law enforcement purposes nor did the Securities and Exchange Commission interpret that Act to apply to information the SEC collected for possible disclosure by the agency to the public); Paperwork and Redtape Reduction Act of 1979: Hearing on S. 1411 before the Subcommittee on Federal Spending Practices and Open Government of the Senate Committee on Governmental Affairs, 96th Cong., 1st Sess., 87 (1979) (testimony of SEC Commissioner Evans that the definition of collection of information in the Federal Reports Act was limited to collection for statistical purposes; testimony of Senator Chiles that Congress was not trying to cripple the mission of the agencies but was "trying to put some governor on this thirst for information"); S. Rep., at 39–40 (explaining that the Senate had rejected the SEC's attempt to limit "collection of information" to collection for statistical purposes, that the definition extended to documents filed with the SEC for possible disclosure to the public by the SEC, and that OMB's review of these filing requirements should consider whether the SEC could use the data either to carry out its regulatory functions or to make it available to the public).

to reach not only statistical compilations but also information collected for law enforcement purposes and information filed with an agency for possible dissemination to the public (*i. e.*, when the agency is an intermediary in the process of data dissemination). This sheds no light on the issue before this Court: Whether the Act reaches rules mandating disclosure by one party directly to a third party. Moreover, other statements in the Committee Reports reinforce respondents' position.[9]

Because we find that the statute, as a whole, clearly expresses Congress' intention, we decline to defer to OMB's interpretation.[10] See *Board of Governors of Federal Reserve*

---

[9] See, *e. g.*, H. R. Rep., at 3 (the Act resulted from "a growing concern that the way *the Government collects, uses, and disseminates* information must be improved") (emphasis added); *id.*, at 22 (explaining the "practical utility" review as a response to the tendency of agencies to "collect reams of data on the basis of need only to store the data unused" thereby imposing "an unnecessary reporting burden on those individuals or organizations being asked to provide it"); S. Rep., at 11 ("[T]he essential purpose of the legislation [is] to reduce the burden on the public in providing information *to the Federal Government*") (emphasis added); *id.*, at 46 ("A Federal agency is considered to 'sponsor' the collection of information if the agency itself collects information or if it uses a procurement contract and the contractor collects information for the agency"); Senate Hearings, *supra*, at 40–41 (testimony of Wayne G. Granquist, Assoc. Dir., OMB) ("No one questions the basic need of the government for information to plan, make policy decisions, operate and evaluate programs, and perform necessary research. The question is rather how much information is essential").

[10] OMB's assumption of the authority to review the three provisions of the hazard communication standard at issue was consistent with its own regulations. See 5 CFR § 1320.7(c)(2) (1988) ("Requirements by an agency for a person to obtain or compile information for the purpose of disclosure to members of the public or to the public at large, through posting, notification, labeling, or similar disclosure requirements, constitute the 'collection of information' whenever the same requirment to obtain or compile information would be a 'collection of information' if the information were directly provided to the agency"); § 1320.7(q) (defining "reporting requirement" as "a requirement imposed by an agency on persons to provide information to another person or to the agency"). Petitioners' argument

*System* v. *Dimension Financial Corp.*, 474 U. S. 361, 368 (1986) ("The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress"); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984) ("If the intent of Congress is clear, that is the end of the matter"). We affirm the judgment of the Third Circuit insofar as it held that the Paperwork Reduction Act does not give OMB the authority to review agency rules mandating disclosure by regulated entities to third parties.[11]

*It is so ordered.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, dissenting.

The Court's opinion today requires more than 10 pages, including a review of numerous statutory provisions and legislative history, to conclude that the Paperwork Reduction Act of 1980 (PRA or Act) is clear and unambiguous on the question whether it applies to agency directives to private parties to collect specified information and disseminate or make it available to third parties. On the basis of that questionable conclusion, the Court refuses to give *any* deference to the Office of Management and Budget's (OMB's) longstanding and consistently applied interpretation that such requirements fall within the Act's scope. Because in my view the Act is not clear in that regard and deference is due OMB under

---

that we should defer to OMB's interpretation, as expressed in these regulations, is foreclosed by our finding of clear congressional intent.

[11] We do not reach the question whether other provisions of the hazard communication standard might legitimately be subject to OMB review under the Paperwork Reduction Act. See 29 CFR § 1910.1200(e) (1988) (requiring employers to develop written programs describing their compliance and make them available to the agency on request); § 1910.1200(g)(11) (requiring employers to make their material safety data sheets available to the agency on request). Only the three provisions OMB disapproved are before us today.

*Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), I respectfully dissent.

In *Chevron, supra,* we set forth the general principles to be applied in cases such as this one:

> "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.,* at 842–843 (footnotes omitted).

As the Court acknowledges, there is no question in this case that OMB is the agency charged with administering the PRA. Unless Congress has directly spoken to the issue whether an agency request that private parties disclose to, or maintain for, third parties information such as material safety data sheets (MSDS's) is an "information collection request" or a "recordkeeping requirement" within the Act's scope, OMB's interpretation of the Act is entitled to deference, provided of course that it is based on a permissible construction of the statute.

The Court concedes that the Act does not expressly address "whether Congress intended the Paperwork Reduction Act to apply to disclosure rules as well as information-gathering rules." *Ante,* at 34. Curiously, the Court then almost immediately asserts that interpreting the Act to provide coverage for disclosure requests is untenable. *Ante,* at

35. The plain language of the Act, however, suggests the contrary. Indeed, the Court appears to acknowledge that petitioners' interpretation of the Act, although not the one the Court prefers, is nonetheless reasonable: "Petitioners' interpretation . . . is not the *most* natural reading of this language." *Ibid.* (emphasis added). The Court goes on to arrive at what it believes is the *most* reasonable of plausible interpretations; it cannot rationally conclude that its interpretation is the *only* one that Congress could possibly have intended. The Court neglects to even mention that the only other Court of Appeals besides the Third Circuit in this case to address a similar question rejected the interpretation that the Court now adopts.[1] In addition, there is evidence that

---

[1] In *Action Alliance of Senior Citizens of Philadelphia* v. *Bowen*, 269 U. S. App. D. C. 463, 846 F. 2d 1449 (1988), the court rejected an argument that the Federal Reports Act of 1942, 44 U. S. C. § 3501 *et seq.* (1976 ed.), the PRA's predecessor, did not cover an agency request that private parties conduct self-evaluations which should then be made available to the public and the agency upon request. The court stated:

"The claim is pure pettifoggery. Appellants cannot seriously believe that in enacting the Reports Act Congress was concerned solely or primarily with private parties' costs of *mailing* data to Washington; it is the record-keeping and data-gathering that constitute the burden. Moreover, OMB and its predecessor, the Bureau of the Budget, have interpreted the statutory term 'collection of information' for nearly half a century to encompass '[a]ny general or specific requirement for the *establishment or maintenance* of records . . . which are to be used *or be available for use* in the collection of information.' Regulation A, Federal Reporting Services, Clearance of Plans and Reports Forms, Title I(1)(e) (February 13, 1943) . . . . Even under the deference we owe the agency, *Chevron U. S. A., Inc.* v. *Natural Resources Defense Council* [, *Inc.*, 467 U. S. 837, 842–845 (1984)], we doubt we could uphold a view of the Reports Act that made physical delivery to an agency essential to the notion of 'collection of information.' Happily we confront no such oddity." 269 U. S. App. D. C., at 467–468, 846 F. 2d, at 1453–1454 (emphasis in original).

Notably, by enacting the PRA Congress intended to *expand* the scope of authority OMB and its predecessor had been given under the Reports Act. See Paperwork and Redtape Reduction Act of 1979: Hearing on S. 1411 before the Subcommittee on Federal Spending Practices and Open Govern-

for years OMB has been reviewing proposals similar to the standard at issue in this case routinely and without objection from other agencies.[2]   As I see it, by independently construing the statute rather than asking if the agency's interpretation is a permissible one and deferring to it if that is the case, the Court's approach is clearly contrary to *Chevron.*

The hazard communication standards propounded by the Occupational Safety and Health Administration (OSHA) require chemical manufacturers to develop hazard information about their products, to adequately label such products, and to prepare for their products MSDS's to be sent to downstream employers who utilize those products.   See 29 CFR §§ 1910.1200(d), (f) and (g) (1988).   Those employers are directed to prepare written hazard communication programs that include a list of hazardous chemicals known to be present at the work site, § 1910.1200(e); to ensure that containers are properly labeled, § 1900.1200(f); and to collect, maintain, and make available to their employees copies of MSDS's with respect to hazardous chemicals that they use in their business, § 1910.1200(g).

OMB, as I see it, reasonably concluded that these requirements were subject to its approval under the PRA, which

ment of the Senate Committee on Governmental Affairs, 96th Cong., 1st Sess., 24–60, 119–125 (1979) (hereinafter S. 1411 Hearings) (comments of OMB and the Comptroller General noting that the proposed legislation would cure deficiencies in the coverage of the Federal Reports Act); S. Rep. No. 96–930, p. 13 (1980).

[2] For example, OMB has reviewed Environmental Protection Agency community right-to-know disclosure requests, 52 Fed. Reg. 38344, 38364 (1987), Federal Trade Commission textile fiber products identification disclosure and fair packaging and fair labeling disclosure requests, 53 Fed. Reg. 5986, 5987 (1988), and Food and Drug Administration nutrition labels.   52 Fed. Reg. 28607 (1987).   In this case, the Secretary of Labor and OMB have consistently agreed that the hazard communication standard is subject to review under the Act.   See 47 Fed. Reg. 12092, 12111 (1982); 48 Fed. Reg. 53280 (1983); 52 Fed. Reg. 31852, 31870 (1987); 53 Fed. Reg. 29822, 29826, 29849–29850 (1988).   Courts should be particularly reluctant to intervene in the regulatory process when the executive agencies have been able to cooperate effectively.

makes OMB responsible for implementing the statutory purpose of minimizing the burden and maximizing the usefulness of the Government's information collection requirements. OMB is instructed to do this through a process of reviewing agency "information collection requests" in order to determine whether "the collection of information by an agency is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility for the agency." 44 U. S. C. § 3504(c)(2) (1982 ed.).

An "information collection request" is defined as "a written report form, application form, schedule, questionnaire, reporting or recordkeeping requirement, collection of information requirement, or similar method calling for the collection of information." 44 U. S. C. § 3502(11) (1982 ed., Supp V). A "recordkeeping requirement" is defined as "a requirement imposed by an agency on persons to maintain specified records." § 3502(17). "Collection of information" is defined as

"the obtaining or soliciting of facts or opinions by an agency through the use of written report forms, application forms, schedules, questionnaires, reporting or recordkeeping requirements, or other similar methods calling for either—

"(A) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or

"(B) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes." 44 U. S. C. § 3502(4) (1982 ed.).

"Reporting requirement" is not specifically defined by the statute.

As it is directed to do by the PRA, see § 3516, OMB has issued regulations and rules for exercising its authority under the statute. Although the statute itself does not in so many

words reach agency directives to collect, disseminate, or make available to third parties specified information that is not delivered to the agency itself, OMB regulations so interpret the Act. The regulations also plainly reach the hazard communication standards that OSHA has presented for OMB's approval in this case.[3]

---

[3] Relevant to this case are the following definitions promulgated by OMB as 5 CFR § 1320.7 (1989):

"(c) 'Collection of information' means the obtaining or soliciting of information by an agency from ten or more persons by means of identical questions, or identical reporting or recordkeeping requirements, whether such collection of information is mandatory, voluntary, or required to obtain a benefit. For purposes of this definition, the 'obtaining or soliciting of information' includes any requirement or request for persons to obtain, maintain, retain, report, *or publicly disclose information.* In the Act, a 'collection of information requirement' is a type of 'information collection request.' As used in this part, a 'collection of information' refers to the act of collecting information, to the information to be collected, to a plan and/or an instrument calling for the collection of information, or any of these, as appropriate.

"(1) A 'collection of information' includes the use of written report forms, application forms, schedules, questionnaires, *reporting or record-keeping requirements,* or other similar methods. Similar methods may include . . . *disclosure requirements* [and] *labeling requirements* . . . .

"(2) Requirements by an agency for a person to obtain or compile information *for the purpose of disclosure to members of the public or to the public at large, through posting, notification, labeling, or similar disclosure requirements,* constitute the 'collection of information' whenever the same requirement to obtain or compile information would be a 'collection of information' if the information were directly provided to the agency. The public disclosure of information originally supplied by the Federal government to the recipient for the purpose of disclosure to the public is not included within this definition.

"(p) 'Recordkeeping requirement' means a requirement imposed by an agency on persons to maintain specified records and *includes requirements that information be maintained or retained by persons but not necessarily provided to an agency.*

"(q) 'Reporting requirement' means a requirement imposed by an agency on persons to provide information *to another person* or to the

I cannot say that these regulations, so far as they are involved here, are inconsistent with the Act. It is not unreasonable to characterize as a "reporting requirement" an employer's obligation to disclose hazard information, by labeling or making MSDS's available, especially in light of the absence of a definition in the statute. Nor is it unreasonable to characterize the obligation to compile copies of MSDS's as a "recordkeeping requirement," or the directive to prepare a hazard communication program with its *list* of dangerous chemicals as an "information collection request" within the meaning of 44 U. S. C. § 3502 (1982 ed., Supp. V). Since that definitional section, after including reporting and recordkeeping requirements, concludes with the words "or other similar method calling for the collection of information," it is tenable to conclude that reporting and recordkeeping are among the information collection requests requiring OMB approval.

Section 3502(4) likewise defines "collection of information" as including reporting and recordkeeping requirements, but that definition begins with the words "the obtaining or soliciting of facts or opinions by an agency" through written report forms, etc. The Court's argument is that this definition limits the PRA to facts or opinions obtained by an agency for its own use and hence excludes recordkeeping, reporting requirements, and information collection designed to inform or benefit third parties such as employees, customers, or the public. This argument, however, pays too little attention to the precise language of the provision. First, an agency does not "obtain" information when it imposes a recordkeeping requirement. Second, § 3502(4) not only speaks of "obtaining" facts and opinions by an agency but of the "soliciting" of facts and opinions by an agency. The word "soliciting" would appear to mean something beside "obtaining" and is commonly understood as including a request for another person to per-

agency. Reporting requirements may implicitly or explicitly include related recordkeeping requirements." (Emphasis added.)

form some act. It is not unreasonable therefore to construe this language as extending OMB's authority to requests for recordkeeping, reporting, and information collection that is intended to benefit third parties but is not delivered to the agency itself.

Furthermore, the Court does not explain why if "information collection requests" and the "collection of information" are limited to agency directives that information be provided *to* the agency, the statutory definitions of those terms explicitly include "recordkeeping requirement[s]." See 44 U. S. C. §§ 3502(4) and (11) (1982 ed. and Supp. V). One response might be that Congress intended to limit the term "recordkeeping requirement" to records prepared for the agency and which must be provided to the agency upon request. But Congress specifically defined the term "recordkeeping requirement" without including such a limitation and it is unlikely Congress intended to imply such a limitation. An agency can certainly "use" information without collecting and analyzing it or periodically auditing it for compliance or enforcement purposes. It can hardly be said that requiring recordkeeping and reporting for the benefit of employees is not useful to the agency or an appropriate means for the agency to carry out its obligation to provide a safe workplace.

It is common ground in this case that if the information required to be reported or made available to employees were first sent to the agency and then distributed to employees, there would be no question about OMB's authority. Likewise, as I understand it, the mere fact that the records ordered to be kept are not physically delivered to the agency does not bar OMB jurisdiction, so long as the records are kept for examination and use by the agency. The Court concedes as much, noting that requests for information provided indirectly to an agency, such as requirements that tax and business records be kept on hand, fall within the PRA's scope because those documents are subject to "possible examination as part of a compliance review." *Ante*, at 33, n. 4.

In support of its argument that the Act applies only when information is actually transmitted to an agency, the Court points to language in the Act's general statement of purpose indicating that Congress was concerned with minimizing "'the cost to the Federal Government,'" maximizing "'the usefulness of information collected, maintained, and disseminated by the Federal Government,'" and reducing the paperwork burdens "'for persons who provide information to and for the Federal Government.'" *Ante*, at 36–37 (emphasis deleted), quoting 44 U. S. C. § 3501 (1982 ed. and Supp. V). The Court ignores, however, the very first statement of purpose in the Act, which declares that Congress intends that the Act "minimize the Federal paperwork burden for individuals, small businesses, State and local governments, and other persons." 44 U. S. C. § 3501(1) (1982 ed.). Reading the Court's discussion of the Act, one might think that Congress was only concerned with minimizing the Government's costs and reducing the paperwork burdens on federal agency employees who are forced to process massive amounts of information. Common sense and § 3501(1) clearly belie that conclusion.[4] Complaints from the private sector about bureaucratic red tape far predate the enactment of the PRA.

Also curious is the Court's reliance on the statement that one purpose of the Act was to reduce the paperwork burden "for persons who provide information to and *for* the Federal Government." 44 U. S. C. § 3501(5) (1982 ed., Supp. V) (emphasis added). Aside from reiterating the point just made regarding the Act's focus on reducing the paperwork

---

[4] In this same vein, § 3504, in setting forth OMB's authority and functions in administering the Act, directs that the information collection request clearance and other paperwork control functions of the Office shall include "setting goals for reduction of the burdens of Federal information collection requests." 44 U. S. C. § 3504(c)(5) (1982 ed.). See also § 3505(1), which directs OMB to set goals to reduce the paperwork burdens by specified percentages, as well as § 3507(a)(1)'s requirement that agencies take action to reduce the paperwork burden of a proposal before submitting such proposals to OMB.

burdens on the private sector, the natural reading of the statement is that Congress recognized that agencies may sometimes request that private parties provide information to others as part of an agency's administration of its duties. It is surely reasonable to conclude that the word "for" means something different than the word "to" and that it includes not only situations in which private parties must keep records available for use and review by an agency, but also requirements that private parties collect and provide information to third parties.

Contrary to the Court's assertions, disclosure requests do present some of the problems Congress sought to solve through the PRA. The Court concedes that Congress intended the Act to apply when information is "filed with an agency for possible dissemination to the public (*i. e.*, when the agency is an intermediary in the process of data dissemination)." *Ante*, at 42. But if that is true, how can it be so clear that Congress intended to permit agencies to bypass the Act by simply requesting private parties to submit information directly to third parties? From a policy perspective, and certainly from the private sector's perspective, it makes little difference whether an agency collects information and then disseminates it or requires those in possession of the information to submit it directly to the relevant third parties. In fact, the latter option generally will impose *greater* paperwork burdens on private parties, although either choice results in a federal agency imposing major paperwork burdens on the private sector. The Court's response is that one approach imposes costs on the Federal Government and the other does not. But that distinction is flawed because it promotes a secondary objective of the PRA and ignores what I consider to have been Congress' primary objective in enacting the statute.

In addition, the legislative history on which the Court relies is unconvincing. Like the statute itself, the legislative history never expressly addresses the question of disclosure

requirements. Of course, the Court can find and cite to legislative history that is allegedly relevant to and supports its interpretation of the statute, but one can just as easily point to legislative history of similar quality supporting an alternative construction of the Act. See *ante*, at 41–42, and nn. 8, 9.[5]

Since the statute itself is not clear and unambiguous, the legislative history is muddy at best, and OMB has given the statute what I believe is a permissible construction, I cannot agree with the outcome the Court reaches. If *Chevron* is to have meaning, it must apply when a statute is as ambiguous on the issue at hand as the PRA is on the subject of disclosure requirements. Contrary to the Court of Appeals and to the majority, I would defer to OMB's position that the obligation to compile copies of MSDS's and the labeling requirements are information collection requests subject to its approval. It follows that OMB was not acting contrary to the statute in disapproving the three provisions specifically involved in this case.

But even accepting for the moment the Court's construction of the statute, it is notable that the Court fails to consider whether the requirement that employers at multiemployer work sites file all of the relevant MSDS's in a central location or exchange them and make them available at their home offices, see 29 CFR § 1910.1200(e)(2) (1988), might be considered a "recordkeeping requirement." Granted, one purpose of the multiemployer standard is to provide workers with an opportunity to learn the dangers associated with the handling of particular materials used on the work site; nonetheless, the proposed standard does not require employers to actually disseminate the MSDS's to their workers. Rather it requires them to physically compile and maintain massive quantities of paperwork at multiemployer job sites, such as construction sites, or their home offices. This requirement

---

[5] In particular, see S. 1411 Hearings, at 61–87; H. R. Rep. No. 96–835, pp. 18–23 (1980); S. Rep. No. 96–930, pp. 13, 39–40 (1980).

certainly looks like a "recordkeeping requirement" in the plainest sense of the term. In addition, the Department of Labor may periodically check these records for compliance with substantive requirements, see §§ 1910.1200(e)(4) and (g)(11), a factor the Court emphasizes in describing which recordkeeping requests are subject to the Act. As I see it, even under the Court's interpretation of the Act, this portion of the standard should be subject to OMB review.

Finally, an argument that the Court does not make but which the United Steelworkers do is that *Chevron* should not apply in this case because OMB's regulations actually determine the scope of its jurisdiction under the Act. This Court has never accepted that argument and in fact, as JUSTICE SCALIA pointed out in his lucid concurrence in *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U. S. 354, 377 (1988), there are good reasons not to accept it, reasons which JUSTICE SCALIA has adequately set forth and which I will not repeat here. I note, however, that *Chevron* itself and several of our cases decided since *Chevron* have deferred to agencies' determinations of matters that affect their own statutory jurisdiction.[6] See, *e. g., Massachusetts* v. *Morash,* 490 U. S. 107, 116–118 (1989); *K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 292–293 (1988); *EEOC* v. *Commercial Office Products Co.,* 486 U. S. 107, 114–116 (1988); *NLRB* v. *Food and Commercial Workers,* 484 U. S. 112,

---

[6] In any event, the PRA itself provides a check on OMB's ability to expand its jurisdiction, at least with respect to independent regulatory agencies. Section 3507(c) provides as follows:

"Any disapproval by the Director, in whole or in part, of a proposed information collection request of an independent regulatory agency . . . may be voided, if the agency by a majority vote of its members overrides the Director's disapproval or exercise of authority. The agency shall certify each override to the Director, [and] shall explain the reasons for exercising the override authority. Where the override concerns an information collection request, the Director shall without further delay assign a control number to such request, and such override shall be valid for a period of three years."

123–128 (1987); *Japan Whaling Assn.* v. *American Cetacean Society*, 478 U. S. 221, 233 (1986); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 845 (1986); *Chemical Manufacturers Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125–126 (1985). The application of *Chevron* principles cannot be avoided on this basis.

For the foregoing reasons, I respectfully dissent.