**UNITED STATES of America**

v.

**CONOCO, INC.**

**Civil Action No. 95–2236.**

United States District Court,
E.D. Louisiana.

Feb. 8, 1996.

582

James Augustine, U.S. Coast Guard, Washington, DC, Paul Stuart Weidenfeld, U.S. Attorney's Office, New Orleans, LA, Michael Donnellan, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, Irving A. Pianin, U.S. Coast Guard, Arlington, VA, for U.S.

Frederick William Bradley, Liskow & Lewis, New Orleans, LA, George A. Phair, Conoco Inc., Legal Department, Houston, TX, for Conoco, Inc.

## MEMORANDUM AND ORDER

SEAR, Chief Judge.

*Background*

Plaintiff United States seeks reimbursement from Conoco pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, of costs incurred by the United States in connection with two oil spills from Conoco's pipelines into the Gulf of Mexico. The essential facts are not in dispute, having been stipulated to by the parties prior to the government's filing of this action. Only a brief summary of the facts is necessary for purposes of this Memorandum and Order.

The United States' claims in this matter relate to two oil spills by Conoco into the Gulf of Mexico. The first oil spill occurred on February 21, 1992, when crude oil spilled from a Conoco pipeline located in Grand Isle Block 43E. The second oil spill occurred on April 30, 1992, when crude oil was discharged from a Conoco pipeline located in Grand Isle Block 40. In both instances, Conoco took prompt action to repair the leaks and mobilized cleanup crews and skimmer boats to clean up the discharged oil.

In response to both spills, the United States Coast Guard undertook various activities, as well, including (1) helicopter overflights to monitor the discharged oil to determine whether additional cleanup activities were necessary; (2) oversight of Conoco's response efforts; and (3) an investigation of the circumstances surrounding the incidents. In connection with the first incident, the Coast Guard incurred costs of $7,841.00 and in connection with the second incident incurred costs of $12,988.16 for these activities.[1] Bills submitted to Conoco for reimbursement of these costs have not been paid by Conoco, prompting the United States to initiate this action seeking the aforementioned sums, interest, penalties and administrative fees.

■ Both parties have filed motions for summary judgment on the issue of whether the Coast Guard may recover from Conoco the costs it incurred in connection with Conoco's cleanup efforts. The issue is a purely legal one. Both parties agree that "removal costs" under the OPA are recoverable by the United States, but disagree on whether the cost of monitoring a private party's cleanup efforts is recoverable as such a "removal cost."

---

1. Conoco does not dispute the accuracy or reasonableness of these sums.

*Analysis*

In construing a statute, the court is "guided not by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy." *Dole v. United Steelworkers of America*, 494 U.S. 26, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990). I have considered the statutory provisions of the OPA, its legislative history, its purposes and the Coast Guard's interpretation of the OPA. Further, I have reviewed and fully appreciate both parties' arguments on the issue.

Under the OPA, the tanker, vessel, or facility that actually discharges oil—the "responsible party"—is strictly liable to pay for removal costs and damages that result from an actual or threatened discharge of oil.[2] The removal costs for which the responsible party is liable include "all removal costs incurred by the United States ... under subsection (c) ... of section 1321 of this title, as amended by this Act."[3] Section 1321(c) provides the government with "removal authority," which includes the authority to "direct and monitor all Federal, State, and private actions to remove a discharge."[4] Finally, the OPA's definitional section of the OPA defines "removal" or "remove" as "containment and removal of oil or a hazardous substance from water ... or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare...."[5]

The United States, advancing what I consider a straightforward reading of these provisions, maintains that they support recovery by the government of the cost of monitoring the efforts of the responsible party who undertakes to clean up its own oil spill. The government is authorized to monitor the cleanup efforts of the responsible party and the OPA defines "removal" as including not only the actual containment or removal of oil but also such other actions as are necessary to minimize or mitigate damage to the public health or welfare. According to the government, oversight by the Coast Guard in this case was necessary to minimize and mitigate such damages because the Coast Guard had to determine whether Conoco's activities were sufficient to contain the spill(s).

Conoco urges a different interpretation of the statutory provisions. According to Conoco, monitoring activities, as opposed to actual removal activities, do not and cannot minimize or mitigate environmental damage within the meaning of § 2701(30). Had Congress meant to include monitoring costs as recoverable removal costs, Conoco argues, it would have phrased the passage "the taking of any other actions as may be necessary **to ensure** minimization or mitigation of damages" but the passage, as written, requires the "other action" to relate directly to the actual containment or removal of oil. According to Conoco, the Coast Guard did not participate in such direct removal activities here. I view Conoco's construction of § 2701(30) as too strained. Although the statute is not a model of clarity, the language is broad enough to comport with the government's interpretation.

Conoco further argues that simply because the government is authorized by § 1321 to monitor private cleanup activities does not mean that the cost of the monitoring is chargeable to the private actor. According to Conoco, only "removal" efforts under § 1321 are recoverable. This argument cannot withstand scrutiny of the OPA provisions as a whole, however, inasmuch as I accept the interpretation of "removal" as encompassing actions beyond actual containment and cleanup, and view the § 2702 reference to § 1321(c) as inclusive rather than exclusive of monitoring costs.

Both parties point to an additional statutory passage in support of their respective arguments. The OPA provides for the creation of the Oil Spill Liability Trust Fund ("OSLTF"), a statutory fund to finance expeditious pollution response efforts and uncompensated damages. According to the OPA, the statutory fund is available for "the payment of removal costs, including the costs of

---

**2.** 33 U.S.C. § 2702(a) (West Supp.1995).

**3.** 33 U.S.C. § 2702(b)(1)(A).

**4.** 33 U.S.C. § 1321(c)(1)(B)(ii) (West Supp.1995).

**5.** 33 U.S.C. § 2701(30).

monitoring removal actions...." [6] The government urges that the language of this provision supports an interpretation of the OPA that treats monitoring costs as a recoverable "removal" cost. The very phrasing indicates that Congress understood the term removal costs to **include** the cost of monitoring removal activities.

In opposition, Conoco urges that if removal costs include monitoring costs it is superfluous to add the phrase "including the costs of monitoring removal actions." Conoco thus suggests that by making specific reference to monitoring costs Congress intended to distinguish them from removal costs. Conoco further argues that because monitoring costs are recoverable from the OSLTF, this indicates that Congress intended such costs to be recovered from that fund alone, not from the responsible party. Conoco points out that it has paid taxes into the fund based on its petroleum produced or imported into the United States, and that to require it to pay for the government's monitoring activities would amount to a double assessment.

I find little logic in Conoco's trust fund argument. First, viewing the word choice in § 2712 as a clue to Congressional intent concerning monitoring costs, it appears, if anything, to serve as a reminder that monitoring costs are subsumed within removal costs. Further, that the OSLTF may be used to fund monitoring activities does not mean that it is the only source from which the government may recoup such costs. As described in one of Conoco's exhibits, the OSLTF has many purposes, one of which is to provide funds so that the government may respond directly to or to monitor responsible parties' actions after an oil spill.[7] The fund has various sources of revenues, including taxes collected from the petroleum industry, interest earned on fund principal from United States Treasury investments, and cost recov-eries, fines and civil penalties collected from responsible parties.[8] The fund is thus a revolving fund: it is expended for authorized purposes and replenished with money from various sources, including sums recovered from responsible parties.[9] I decline to treat the fund as the **sole** source of recompense for the government's monitoring costs.

Conoco references several recent amendments to the National Contingency Plan ("NCP") in further support of a construction of the OPA which excludes monitoring costs.[10] The NCP serves as a guide to regulators and regulated parties in the enforcement, administration and interpretation of environmental law, including the OPA. The NCP regulations cited by Conoco are those addressing preliminary assessment and initiation of action by government agencies, and provide in pertinent part that

[i]f the responsible party does conduct the removal, the OSC [On–Scene Coordinator] shall ensure adequate surveillance over whatever actions are initiated. If effective actions are not being taken to eliminate the threat, or if removal is not being properly done, the OSC should ... advise the responsible party. If the responsible party does not respond promptly, the OSC shall take appropriate response actions and should notify the responsible party of the potential liability for federal response costs.[11]

In carrying out a response under this section, the OSC may:

(i) Remove or arrange for the removal of a discharge ... at any time;

(ii) Direct or monitor ... private actions to remove a discharge.[12]

According to Conoco, under these provisions the trigger for liability for government response costs, including monitoring

---

6. 33 U.S.C. § 2712(a)(1).

7. *See* Exhibit 5 to Conoco's Cross Motion for Summary Judgment (United States Coast Guard National Pollution Funds Center FY94 Annual Report).

8. *Id.*

9. *See* 26 U.S.C. § 9509(b).

10. *See* 59 Fed.Reg. 47,444 et seq. (1994) to be codified at 40 C.F.R. 300.300 et seq.

11. 59 Fed.Reg. 47,384 (1994), to be codified at 40 C.F.R. § 300.305(d).

12. 59 Fed.Reg. 47,444 (1994), to be codified at 40 C.F.R. § 300.305(d).

costs, is the refusal or inability of the responsible party to remove the discharge or a determination by the OSC that the responsible party's efforts are inadequate. Conoco maintains that because it is undisputed that Conoco's efforts were adequate, the "trigger" was never pulled and thus the government may not recover its monitoring costs.

The government urges that contrary to Conoco's reading, this regulation simply does not permit a responsible party to escape all liability for government response costs by undertaking an ultimately successful removal effort. The very language cited by Conoco indeed directs the OSC to ensure not simply that actions are taken, but that **effective** actions are taken. To deny recovery of costs associated with ensuring such effectiveness places a limitation on the statute that is not clearly intended by the aforementioned regulations.

The legislative history is not inconsistent with, and the purpose of the OPA comports with, the government's construction of the statute. The OPA was enacted in 1990 in the wake of the nation's largest oil spill in history—the 11 million gallon spill from the Exxon Valdez in Prince William Sound, Alaska.[13] The OPA amended, expanded and strengthened the requirements of pre-existing statutes that addressed oil spill cleanup, liability and compensation.[14] Before the OPA, the Federal Water Pollution Control Act ("FWPCA") authorized, but did not require, federal removal of oil spills and approval of oil spill response plans.[15] The OPA amended the FWPCA to require such efforts and to expand the oversight and cleanup responsibilities of the federal government. The OPA also increased potential liabilities of responsible parties and significantly broadened financial responsibility requirements.

 Finally, the policy of the Coast Guard since enactment of the OPA in 1990 appears to have been to collect monitoring costs from responsible parties. Based on my review of the Coast Guard directives cited by both parties,[16] I view as rational the government's construction of these documents as authorizing initial resort to the OSLTF for monitoring costs, followed by recovery of such costs from the responsible party where, as here, such costs are more than *de minimus* and are incurred after the initial assessment phase. The construction of the statutory scheme entrusted to the agency to administer is entitled to considerable weight where it is a rational construction. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

 Based on the foregoing discussion, I conclude that monitoring costs are included in removal costs which the government may seek to recover from a responsible party.

Accordingly,

IT IS ORDERED that the United States' Motion for Summary Judgment IS GRANTED, entitling the United States to (1) the sum of $7,841.00 for the February 21, 1992 oil spill, together with interest accruing on that sum at the rate set by 31 U.S.C. § 3717(a)(1) from June 18, 1992; a six percent penalty pursuant to 31 U.S.C. § 3717(e)(2); and an administrative fee of $10 per month beginning on June 18, 1992, pursuant to 31 U.S.C. § 3717(e)(1) and (2) the sum of $12,988.16 for the April 30, 1992 spill, together with interest accruing on that sum at the rate set by 31 U.S.C. § 3717(a)(1) from July 23, 1992; a six percent penalty pursuant to 31 U.S.C. § 3717(e)(2); and an administrative fee of $10 per month beginning on July 23, 1992, pursuant to 31 U.S.C. § 3717(e)(1).

IT IS FURTHER ORDERED that Conoco's Cross–Motion for Summary Judgment IS DENIED.

---

**13.** *See* S.Rep. No. 101–94, 101st Cong., 2d Sess., *reprinted in* 1990 U.S.Code Cong. & Admin.News 723.

**14.** *Id.* at 724.

**15.** *Id.* at 729.

**16.** *See* Exhibit D to Memorandum in Support of United States' Motion for Summary Judgment; Exhibits 7, 8 and 9 to Memorandum in Support of Conoco's Cross–Motion for Summary Judgment.