**In re Mario & Lorenza CASTILLO, Debtors.**

**Bankruptcy No. 96–31717.**

United States Bankruptcy Court, W.D. Texas, El Paso Division.

April 22, 1997.

Jerry Tanzy, Edgar J. Borrego, Office of Jerry Tanzy, El Paso, TX, for Debtors.

Harrel L. Davis, III, Krafsur, Gordon, Mott, Sanders & Miranda, P.C., El Paso, TX, for Government Employees Credit Union.

### DECISION ON GOVERNMENT EMPLOY-EES CREDIT UNION'S REQUEST TO COMPEL DEBTORS TO COMPLY WITH SECTION 521 OF THE UNITED STATES BANKRUPTCY CODE

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration in the above styled proceeding a motion by Government Employee's Credit Union (GECU) to compel debtors to comply with section 521 of the United States Bankruptcy Code. The issue is whether a chapter 7 debtor may retain collateral that secures a lien without either reaffirmation of the obligation under 11 U.S.C. § 521(2), or redemption of the collateral under 11 U.S.C. § 722. Upon review of the authorities, and the argument and briefs of the parties, the court concludes that a chapter 7 debtor is not limited to those express options. The following constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

#### Background Facts

Prior to filing for bankruptcy, Mario Castillo and Lorenza Castillo ("debtors") purchased a 1994 Volkswagen Jetta. This purchase was financed by a secured loan from Government Employees Credit Union ("GECU"). A second loan was later made by GECU. This loan also was secured by the Jetta (in the form of a second lien). At the time of the bankruptcy filing, the total indebtedness on GECU's secured claims was $19,272.62.

Post filing, GECU has continued to receive payments on the car loan from the Castillos. This is not enough to satisfy GECU, however. Citing to section 521(2)(A), GECU claims that the Bankruptcy Code requires debtors with consumer debts secured by property of the estate to file a statement

with the clerk of the debtors' intention to claim the property as exempt, redeem the property or reaffirm the debts securing such property.[1] This, they note, the debtors have not done. Instead, the debtors have exercised what that believe to be a fourth option available to them under the language of section 521(2)(A), namely, retention of the vehicle and continued timely payments on the installment loan [2] They call their notice an "informal reaffirmation" of the debt. *See* Chapter 7 Individual Debtor's Stmt. of Intention. The debtors believe this option falls under certain "if applicable" language in section 521(2)(A).

There is, of course, no express statutory provision for what the debtors are calling an "informal reaffirmation." The debtors are simply using the terminology to describe their intention to continue to retain the collateral, to make timely payments to the secured creditor, and to abide by the original terms of the loan agreement subject, of course, to any modifications to the agreement caused by a discharge from bankruptcy. In effect, the debtors expect the car loan to "ride through" the bankruptcy, leaving the creditor with all of its nonbankruptcy rights *vis-a-vis* its collateral. Any deficiency claim which the creditor might suffer it would suffer in any event, just as do all other secured creditors in bankruptcy. The debtors believe that, so long as the payments are current, there is no need to either redeem the collateral or reaffirm the debt.

The dispute, then, in this case is only facially about whether section 521(2)(A) af-fords a "fourth alternative" to debtors who are current on consumer secured debt. The push behind the battle over the interpretation of section 521(2)(A) comes not so much from the impact on the secured creditor's secured claim but rather from the impact on its potential *unsecured* deficiency claim. Outside of bankruptcy, a lender has recourse to both the collateral pledged and to the personal liability of the borrower. If the borrower files bankruptcy, the resulting discharge eliminates the personal liability of the borrower for the debt,[3] converting the loan from recourse to nonrecourse. This process has often been called "lien stripping" because it in effect converts the face value of the creditor's claim to the value of the collateral.[4]

Creditors might not find lien stripping quite so objectionable were the value of the creditor's collateral to keep pace with the monthly payments on the debt the collateral secures. In such an instance, a "strip down" of the loan to the value of the secured property would have little or no economic effect because the debtor would always owe an amount equal to or less than the value of the collateral. However, when the value of the collateral depreciates at a rate that outpaces the payments made by the debtor, as is often the case with car loans, the strip down effect of bankruptcy on the lien that the creditor holds can be dramatic.[5]

An "informal reaffirmation" has no effect on the impact of the bankruptcy discharge on the creditor's claim. Even though the payments are current, giving the appearance of

1. GECU also complains of the timeliness of payments on the car loan.

2. The debtors desire the fourth option because, understandably, they are disinclined to become personally liable on the vehicle note again, and their economic circumstances make it impossible for them to payoff the balance of the note in a lump sum at this time.

3. Technically, the personal liability is not actually eliminated. It is in effect eliminated, however, because the debtor benefits from a permanent injunction against any further efforts to pursue personal liability actions.

4. *See* 11 U.S.C. § 506(a). The unsecured deficiency claim may in fact be satisfied in whole or in part if there is sufficient money in the bankruptcy estate. *See* 11 U.S.C. § 726(a). All too often, however, many bankruptcy cases are "no-asset" cases, in which no distribution will be made to any unsecured claim, including deficiency claims of secured creditors.

5. In oral argument, GECU's counsel expressed their concern with having "recourse" debt converted into "non-recourse debt" as one justification for their desire to compel a formal reaffirmation of the debt (which would insulate the creditor from the bankruptcy discharge and maintain the pre-bankruptcy recourse character of the loan). The facts of this case highlight why GECU is concerned. GECU holds a total claim for $19,272.62, secured by a 1994 Volkswagen Jetta. It is not likely that the vehicle is worth anything close to the amount of this claim.

a fully performing loan, the debt has nonetheless been converted into a nonrecourse claim as a result of the bankruptcy filing. The creditor knows that, if the debtor should default at some later date after the bankruptcy is over, the creditor will have to look solely to its collateral for satisfaction. If it anticipates that the collateral is not now or will not likely be sufficient to fully satisfy the debt (and it will probably not be if it is a motor vehicle), then the loan cannot be said to be "fully performing" in the normal sense, even though the payments are current. The debtor might still be motivated to completely pay off the balance of the car loan, because she needs the car, in which case the creditor will not have suffered any actual, economic harm from the debtor's having filed bankruptcy. However, the debtor might also choose to "walk away" from the vehicle at some future point, secure in the knowledge that she will not be sued for any deficiency the creditor might suffer, leaving the creditor with only the value it can recover out of the vehicle at that future point. That value might be substantially less a percentage of the remaining balance due than it is at the time of bankruptcy, leaving the creditor to suffer a potentially larger deficiency than it otherwise might have had it simply been able to take back the vehicle when the debtor filed bankruptcy.

Thus, an "informal reaffirmation" is nothing more than a simple statement by the debtor that she does *not* intend to surrender the vehicle, nor does she intend to redeem it with a lump sum cash payment for its current value (as she could under section 722), and neither does she intend to reaffirm the debt to insulate the creditor from the discharge of its undersecured deficiency claim (as she could under section 524). The debtors here believe they have this alternative because they do not believe that any creditor can *compel* reaffirmation of any debt, nor can any creditor *require* the redemption of any collateral, and the so-called statement of *intention* contemplated by section 521(2)(A) cannot be tortured into a directive that the debtor must do one or the other (redemption or reaffirmation) if it plans to keep a given item of collateral rather than to surrender that item. Both redemption and reaffirma-

tion are described as voluntary options available to a debtor in chapter 7, and are nowhere mandated as the exclusive choices which a debtor who elects to retain exempt property must make. Thus, the debtors believe that they are justified in exercising this "fourth alternative," notifying the creditor of their intention to retain rather surrender the collateral, but declining to exercise either the redemption or the reaffirmation option. The secured creditor as a result is of course subjected to the impact of the bankruptcy discharge, but that is a by-product of the bankruptcy filing itself, and not the debtors' statement of intention. There is no principled reason why this sort of creditor, as distinct from any other creditor, ought to be singled out for insulation from the impact of discharge in bankruptcy, and section 521(2)(A), goes the argument of the debtors, should not (and need not) be read to create such a special exception.

GECU, on the other hand, believes that just such an exception (or immunity from discharge) *is* implied by the requirements set out in section 521(2)(A) for filing a statement of intention with respect to collateral that secures consumer debt. By its reading, GECU says that Congress evidenced a concern that, if a debtor was going to keep what she claimed to be exempt property, then she ought to be put to the choice of either redeeming the property for its fair market value in a cash, lump sum payment, or reaffirming the debt and so effectively insulating the creditor from the impact of the discharge. If the debtor has the financial wherewithal to take out the lender with a cash payment (via the redemption process), then the lender will still suffer the effects of a lien stripdown, but will at least not have to endure the possibility of further erosion of its collateral value over time. If, on the other hand, the debtor wants to keep the property, then the effect of section 521(2)(A), according to GECU, is to prevent the debtor from shifting the risk of future erosion in the value of the collateral to the lender, without recourse. The debtors who wish to keep exempt property subject to consumer debt must, therefore, forego the bankruptcy discharge as the price for retaining the use of

the property (short of cashing the creditor out right away). Section 521(2)(A), says GECU, simply engrafts onto the Code a special immunity for that narrow class of secured creditors in a chapter 7 case who do not get their collateral back (as do other secured creditors, per section 725) and who are instead converted into nonrecourse creditors while the debtor keeps the property and uses it.

Thus, the interpretation of section 521(2)(A) selected by the court will affect whether creditors in the position of GECU do or do not enjoy a special immunity from the bankruptcy discharge. GECU's interpretation would confer just such an immunity. The debtor's interpretation, on the other hand, presumes that Congress intended no such special immunity for creditors in GECU's position, and that none was created by the enactment of section 521(2)(A). We are thus called upon to decide which interpretation of the statute is correct, and so whether Congress created a "special immunity" from the bankruptcy discharge for consumer secured lenders.

### Analysis

The debtor's obligation to the Credit Union is a consumer debt secured by property of the estate. As such, the debtors are required by section 521 to file a statement of their intentions regarding that property. Specifically, section 521(2)(A) provides:

> if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate—
>
> (A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, with such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is

claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property

11 U.S.C. § 521(2)(A).

The relevant portion of the statute requires the debtor to file her intention "and, if applicable," specify whether the debtor claims the property to be exempt, whether the debtor intends to redeem the property, or that the debtor intends to reaffirm the debt. Courts dealing with this provision have differed over whether Congress intended the alternatives listed (*i.e.*, "that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property") to be exclusive or whether the term "if applicable" provides a debtor with a "fourth alternative" (*i.e.*, retention without either redemption or reaffirmation).[6] Although circuit courts have addressed this exact issue, there is little consensus on the approach courts take, much less any consensus on what the answer is. We nonetheless begin by reviewing the approaches that the circuit courts have taken to date.

### A. Case Law

In *Lowry Federal Credit Union v. West,* 882 F.2d 1543 (10th Cir.1989), the first ruling on the issue by a court of appeals, the Tenth Circuit held that section 521(2) is indeed mandatory in compelling the filing of a statement of intentions, but that the statute does not exhaust the universe of options available in terms of stated intention to reaffirmation, redemption or surrender. The circuit court found that the bankruptcy court had acted within its discretion when it allowed the debtor to pursue another course of action not expressly stated in the statute, to wit, the simple retention of the collateral while maintaining payments.

In *Lowry,* the debtors sought to retain and to continue to make the payments on a pickup truck against which Lowry Federal Credit

---

**6.** We say "fourth alternative" because the first two options (redemption or reaffirmation) arise only in the event the debtor intends to retain the property. The "third alternative" is that the

debtor intends to *surrender* the property, in which event, of course, neither redemption nor reaffirmation would likely be applicable.

Union (the "Credit Union") held a lien.[7] The creditor complained that the debtors had failed to comply with section 521(2)(A), because the statement of intention the debtors had filed declared only that they would retain the property, and did not go on to specify whether they intended to either redeem the collateral or to enter into a reaffirmation agreement with the Credit Union. The Credit Union urged that the debtors' omission allowed the creditor to demand surrender of the property. The bankruptcy and district courts disagreed.

The Tenth Circuit affirmed, not as a matter of law but rather under an abuse of discretion standard. Indeed, that the requirements of section 521(2) are mandatory the court characterized as "obvious." *Id.* at 1545. That conclusion, however, tells a court nothing about the creditor's alleged right to "automatically" reclaim the property. The statute is simply silent regarding remedies *viz.* the creditor for whose evident benefit the statute was written. Section 704(3) obligates the *trustee* to insure that the debtor complies with section 521, but gives no teeth to that responsibility as it is not coupled with specific enforcement powers. *Id.* at 1546.

The lack of an express remedy suggested to the Tenth Circuit that the bankruptcy court has discretion to allow debtors to proceed down other paths than those expressly described in section 521(2) itself. *Id.* ("[w]hile a debtor may redeem property, subject to 11 U.S.C. § 722, or reaffirm a debt, subject to 11 U.S.C. § 524(c)(4), nothing within the Code makes either course exclusive"). So finding, the court next addressed the creditor's argument that the obligation was in default because of the terms of the loan's *ipso facto clause.*

The creditor argued that it was entitled to immediate possession of its collateral because the mere filing of bankruptcy was an event of default under the loan documents, violative of the loan's *ipso facto* clause, and that allowing the debtors to keep the vehicle would be both

contrary to the terms of the credit agreement and prejudicial to the financial interests of the creditor. *Id.* The court rejected these arguments. First, the court found that the creditor was at no greater risk as a result of the filing of a bankruptcy petition than it would have been had no such petition been filed. In fact, the creditor presented no evidence of prejudice (evidently presuming that such prejudice would be self-evident). Had the creditor come forth with evidence to support the dreadful possibilities it posited, the court admitted it might have been persuaded to the contrary. *Id.* However, "[s]ince the debtors are current, and since nothing in the record suggests a significant disparity between the value of the collateral and the amount of the debt, the effect of the bankruptcy court's ruling is to put the parties where they were prior to bankruptcy." *Id.* at 1546–47. That conclusion of course did not consider the possible ramifications of a later default, when the collateral might be worth less than the creditor's claim, though the court did admit that "[w]hether there will ever be a default that will leave a portion of the debt subject to discharge is problematic." *Id.* at 1547 n. 6.

In the next decision issued by a court of appeals, *In re Edwards,* 901 F.2d 1383 (7th Cir.1990), the Seventh Circuit agreed with *Lowry* in concluding that section 521(2) provided the exclusive list of debtor options. Similarities to *Lowry* stopped there, however.

The facts in *Edwards* were similar to those in *Lowry:* the debtors wanted to retain possession of their vehicle and to continue to make payments on the debt. The debtors did *not* wish to formally reaffirm the debt. *Edwards,* 901 F.2d at 1384. The Seventh Circuit expressed concern that allowing a debtor to retain collateral without reaffirming the obligation gave the debtor too much power. Indeed, the court expected that no debtor would ever reaffirm a debt unless she was compelled to do so. *Id.* at 1386.[8] Thus,

---

7. Under the terms of the security agreement, the bankruptcy itself was not a default.

8. This conclusion is puzzling, given that reaffirmation is described as a *voluntary* decision of the debtor, by definition made only with respect to

*unsecured* debts (for only unsecured obligations are discharged). *See* 11 U.S.C. § 524(c), (d). Is the Seventh Circuit suggesting that it was the intention of the Code's drafters to *encourage* reaffirmation agreements, or worse, to *compel* their

the court concluded that reaffirmation, redemption and surrender were the only options available to a debtor with respect to consumer debt secured by exempt property.

The court claimed to garner support for this conclusion from its reading of congressional intent underlying the 1984 Consumer Credit Amendments:

> The 1984 Consumer Finance Amendments to the Bankruptcy Code were intended, *inter alia,* to protect creditors from the risks of quickly depreciating assets and to keep credit costs from escalating because of the too-ready availability of discharge. *See In re White,* 49 B.R. 869, 872 (Bankr. W.D.N.C.1985). The legislative purpose speaks strongly against permitting debtors to improve their position dramatically against secured creditors by relieving them of personal liability. When a debtor is relieved of personal liability on loans secured by collateral, the debtor has little incentive to maintain the property in which a creditor retains a security interest. The value of the collateral may fall below the level of the loan, leaving the creditor undersecured and driving up future costs.

*Id.* at 1386. The *Edwards* court unsurprisingly rejected the Tenth Circuit's approach in *Lowry,* by which a debtor might be able to shift risk of loss to the secured creditor, as inconsistent with an evident intent to prevent just such risk-shifting.

The same year, in *Home Owners Funding Corp. of America v. Belanger (In re Belanger),* 962 F.2d 345, 348 (4th Cir.1992), the Fourth Circuit held that the options described in section 521(2) were specifically *not* the only available alternatives for debtors. The court's analysis largely tracked the well-supported logic of the lower courts' decisions. *See* 128 B.R. 142 (E.D.N.C.1990); 118 B.R. 368 (Bankr.E.D.N.C.1990).

The lower courts in *Belanger* had held that section 521(2) requires only that the debtor state its intention to retain the collateral or to surrender it, and that the debtor need further disclose an intention to either redeem or reaffirm only *if* those options are *applicable.* The Fourth Circuit found that interpre-

tation to be consistent with *Collier*'s construction of the statute and "complies with the canon that courts should give effect, if possible, to every word in a statute." 962 F.2d at 348 (citation omitted). Unlike the courts in *Edwards* and *Lowry,* the Fourth Circuit refused to find the phrase "if applicable" gratuitous. Commented the court:

> The phrase 'if applicable' is redundant if, contrary to *Collier* and the district court, the options given to the debtor are considered to be exclusive. If this were so, § 521(2)(A) would have simply provided: 'and specifying that such property is claimed as exempt, that the debtor intends to redeem such, or that the debtor intends to reaffirm debts secured by such property.' The fact that the statutory options are stated in the disjunctive shows the words 'if applicable' are unnecessary under a construction of the statute that makes the options exclusive. But if the phrase 'if applicable' is given effect, it plays an important role.

*Id.*

The district court had explained the importance of the phrase: accepting the creditor's proffered interpretation of section 521(2) leaves debtors at the mercy of the secured party. Because chapter 7 redemption is prohibitively expensive for most debtors, the only practical alternative available to most debtors who want (or need) to keep exempt property (such as a car needed for getting to work) is reaffirmation. Yet reaffirmation, by the terms of the statute itself, must be *consensual. See* 11 U.S.C. § 524(c). Thus, the creditor's approach to the statute creates the odd anomaly of a debtor being *compelled* to do a *voluntary* act (and on the creditor's terms, no less, as the creditor cannot be compelled to agree to any reaffirmation terms it finds to be unacceptable) as a condition to retaining the collateral. *Id.* at 348.

The secured creditor protested that permitting a "fourth alternative" unduly burdened the secured creditor while extinguishing any personal exposure the debtor might have to a deficiency in the event of default or

execution with regard to secured claims? *See* discussion *infra.*

destruction of the property. Rejecting this position the court stated:

> [The creditor] is no more vulnerable than any lender under a consumer installment sales contract. [citation omitted.] A purchaser who cannot satisfy a deficiency judgment can generally file a bankruptcy petition and obtain discharge. This is a risk the creditor takes on any installment loan. Similarly, if a debtor in default surrenders the collateral during bankruptcy proceedings, the creditor must sell it, and the discharge of the debtor will bar collection of the deficiency. The same result would follow a trustee's sale. [citations omitted.]
>
> When a nondefaulting debtor is discharged while retaining the collateral, the principal disadvantage to the creditor is the possibility that the value of the collateral will be less than the balance due on the secured debt. But this risk is in all installment loans, and presumably the creditor has structured repayment to accommodate it. If the debtor defaults by, for example, omitting payment, allowing insurance to lapse, or failing to maintain the collateral properly, the creditor can repossess the collateral and sell it. [citation omitted.] The bar to recovering any deficiency is the same after bankruptcy as it would have been had the collateral been sold during the bankruptcy proceedings. If the debtor does not default, the creditor receives the full benefit of the bargain despite the bankruptcy.

*Id.* at 348–9.

Finally, the court rejected the suggestion that debtors who wants to retain collateral and maintain installment payments should file chapter 13. Chapter 13, the court reasoned, envisioned new arrangements, not a continuation of a contract to which the parties had previously agreed. The court saw no reason why a debtor should be compelled to opt for chapter 13 simply because she wanted to remain current on a contract. *Id.*

A more recent ruling comes from the Eleventh Circuit, in *Taylor v. AGE Federal Credit Union (In re Taylor)*, 3 F.3d 1512 (11th Cir.1993). Like the Seventh Circuit, the *Taylor* court premised its conclusion on what it viewed to be the plain and unambiguous language of the statute. The court rejected the opinions of several other lower courts and the Fourth Circuit's decision in *Belanger* that the language "if applicable" in section 521(2) created either any ambiguity in the statute or alternatives not expressly set forth in the statute. *Taylor*, 3 F.3d at 1516. Commented the court:

> Referring to the language preceding the phrase 'if applicable,' it is clear when the options of redemption and reaffirmation would not be applicable. This language does not apply to a debtor's surrender of the property; it therefore must apply to a debtor's retention of property. If a debtor retains secured property, then the options of redemption and reaffirmation are applicable and the debtor is required to redeem or reaffirm.

*Id.* at 1516.

The court found further support for its plain language interpretation in subsection (B), which provides that the debtor must "perform his intention with respect to such property ..." within forty-five days of the filing of the statement of intention. Concluded the court:

> An option to retain and keep current is not an act capable of performance within forty-five days. This option provides that the debtor's performance not be concluded until the expiration of the contract, a period of time ordinarily beyond the forty-five day limit. Additionally, retention is not a duty that the debtor needs to 'perform,' as the debtor already has possession of the property.

*Id.*

Lastly, the court reasoned that to allow the debtor to retain the property without reaffirming or redeeming would give the debtor a *head start*, not just a *fresh start* "since the debtor effectively converts his secured obligation from recourse to nonrecourse with no downside risk for failing to maintain or insure the lender's collateral." *Id.*

## B. Reviewing the Cases

Unfortunately, as the foregoing review demonstrates, it is difficult to derive any one

clear rule from the case law. Indeed, the circuits themselves have been unable to agree on what the plain meaning of the statutory language might be, or even whether the language is plain at all. *See Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588, 595 (1990) (explaining plain meaning approach to statutory interpretation, and advising that resort to legislative history to determine legislative intent is not appropriate unless the plain language of the statute is ambiguous).

The Seventh Circuit's opinion in *Edwards*, 901 F.2d 1383, for example, summarily announces that a fourth alternative is simply not available to debtors because retention without either redemption or reaffirmation was simply not what Congress intended. Support for that position, suggests the court, can be found in the general legislative history concerning the impetus for all the 1984 amendments to the Code. *Id.* at 1386. The court fails to explain how it could even draw upon the legislative history for this proposition, given the court's presumption *that* the statute is clear on its face. *See Davenport*, 495 U.S. at 557–58, 110 S.Ct. at 2130. The court's resort to the legislative history, suggests that it is less than comfortable with this presumption, and the language of the decision at least betrays a concern on the court's part that the statute may *not* be clear and unambiguous on its face.

In *Lowry*, 882 F.2d 1543, the Tenth Circuit more candidly admitted that the language of the statute is problematic, but its approach to solving the problem was questionable. Placing their analysis in a footnote, the *Lowry* court rejects the debtors' suggestion that "if applicable" gives the debtor a fourth alternative, on grounds that this approach is inconsistent with the "plain meaning" of the statute. A plain meaning, according to that circuit, requires that the phrase "if applicable" be read instead as *gratuitous* language.[9] This conclusion not only offers an interesting twist on the plain meaning doctrine of statutory interpretation, *see Davenport*, 495 U.S.

at 557–58, 110 S.Ct. at 2130, but also ignores a basic tenet of statutory construction that requires every word in a statute to be given effect, if possible. *See Dole v. United Steelworkers*, 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *see also Oregon v. ACF Industries, Inc.*, 510 U.S. 332, 333, 114 S.Ct. 843, 845, 127 L.Ed.2d 165 (1994) (it is an "elemental canon of construction that a statute should be interpreted so as not to render one part inoperative").

Perhaps these opinions can best be understood as expressions of "preconceived notions" regarding how bankruptcy should affect consumer secured creditors. For example, *Edwards* adverts to discharges which are "too-readily" available, 901 F.2d at 1386, while the *Lowry* court observes that an "informal reaffirmation" would prejudice neither the debtor nor creditor. 882 F.2d at 1546; *see generally In re Parlato*, 185 B.R. 413, 417 (Bankr.D.Conn.1995). Policy-driven interpretations such as these do not assist us in discharging our basic duty to faithfully interpret statutes in accordance with generally accepted principles of statutory interpretation. Both *Lowry* and *Edwards* seemingly fail to appreciate that there are, in fact, two sensible, yet diametrically opposite, ways to read section 521(2). The *Taylor* and *Belanger* decisions lay out these two possible readings, and so better lay the groundwork for the task of statutory construction.

In *Taylor*, the Eleventh Circuit read the "if applicable" language to refer to the precursor clause which directs the debtor to choose between surrendering or retaining the property ("the debtor shall file ... a statement of ... intention *with respect to the retention or surrender of such property*"). If the property is not surrendered, says the court, then the subsequent clause ("specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm

---

9. In point of fact, the *Lowry* decision finds that the phrase *"if appropriate"* is gratuitous and, therefore, without affect on the mandatory duties prescribed by the statute. We presume, because the statute does not include the phrase "if appropriate" and the general discussion is on the "if applicable" language, that the Tenth Circuit is referring to "if applicable."

debts secured by such property") becomes "applicable" so that the debtor is, in the event of retention, obligated to notify the creditor whether she is claiming the property as exempt, and whether she intends to redeem the property or reaffirm the secured debt. *See, e.g., Taylor*, 3 F.3d at 1516. This is one reasonable interpretation to give to the "if applicable" language and how it might function in the overall operation of this statute.

The other interpretation of this same language was explicated by the Fourth Circuit in *Belanger*. That court suggests that the precursor clause ("the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property") imposes an affirmative duty on the debtor to disclose whether the debtor intends to keep the property in question or to give up that property. The duty is mandatory because, of course, the choices are mutually exclusive and exhaust the universe of possible choices—either the debtor intends to keep the property, or the debtor intends to surrender the property, and there is simply no third possible alternative. The language following the "if applicable" phrase ("and, *if applicable*, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property") merely supplements this duty, requiring the debtor to disclose whether he intends to employ one of these alternatives. An additional disclosure would, under this interpretation, *not* be required if these options (redemption or reaffirmation) were not going to be employed, *i.e.*, they would not be "applicable." *See In re Belanger*, 962 F.2d at 347; *see also First North American Nat. Bank v. Doss (In re Doss)*, 203 B.R. 57, 59 (Bankr.W.D.Va.1996) (explaining *Belanger* interpretation in detail).

Both of these interpretations are at least facially valid readings of the plain language employed by Congress. Neither ignores the statutory requirement that each word be given effect and both propose a plausible interpretation of the "if applicable" phrase. Because there are *two* "plain meanings" of the statutory language, then, the statute is facially ambiguous, requiring the court to resort to other sources to divine Congress' intent in order to arrive at a correct interpretation of the statute. *Davenport*, 495 U.S. at 557–58, 110 S.Ct. at 2130; Accordingly, we turn to an examination of the legislative history to section 521(2)(A).

C. LEGISLATIVE HISTORY

When the Code was enacted in 1978, section 521 did not contain any requirement that a debtor file a statement of intention. *See* 11 U.S.C. § 521(2) (1978). The additional duty was added by amendments in 1984. *See* H.R. 5174, 98th Cong., 2d Sess. (1984). Unfortunately, as many courts have noted, the 1984 amendments provide scant legislative history to section 521. *See In re Eagle*, 51 B.R. 959 (Bankr.N.D.Ohio 1985) (noting that "the legislative history on the consumer credit amendments is woefully inadequate as H.R. 5174 was pushed through the House of Representatives in two days"); *In re Barriger*, 61 B.R. 506, 509 (Bankr.W.D.Tenn.1986). This does not mean, however, that we are without *any* legislative history on the formation of section 521(2).

As recounted by Judge A. Thomas Small, the bankruptcy judge who wrote the lower court decision in *In re Belanger, see*, 118 B.R. 368 (Bankr.E.D.N.C.1990), the original idea for the "debtor's statement of intention" came from a proposal submitted by a coalition of creditors (the "bankruptcy discussion group") in 1981. The impetus for their proposal, the substance of which was modified little in 1984,[10] was not to limit debtors to one

---

**10.** The relevant part of the 1981 proposal provided:

> If the debtor's schedules include consumer debts which are secured by property of the estate, the debtor shall, within 10 days after filing the petition, file and serve upon each creditor holding such security and the trustee, a statement of the debtor's intention with respect to retention or surrender of the collater-

al. Such a statement shall include, if applicable, a statement that the collateral is claimed as exempt, that the consumer intends to redeem the collateral, or that the debtor intends to reaffirm debts secured by the collateral. Hearing Before the Subcommittee on Courts of the Committee on the Judiciary, United States Senate, on the Bankruptcy Reform Act of 1978,

of three explicitly stated options—redeem, surrender or reaffirm—but rather to assure that creditors receive prompt notification of a debtor's intentions with respect to their collateral early in the bankruptcy process, so that the creditor could take appropriate action to protect its interests. Creditors were simply concerned with the Bankruptcy Code's failure to set a specific time by when such creditors would know the fate of their collateral.[11] The bankruptcy decision in *Belanger* does not detail how this initial proposal made its way into the Bankruptcy Code as section 521, *id.* at 371, but recently the evolution of the original 1981 proposal through the twists and turns of the legislative process into the 1984 amendments was painstakingly traced by an article appearing in the *Journal of Bankruptcy Law & Practice. See* Richard H. Nowka, *Validating a Debtor's Continued Retention of Collateral by Continuing Performance: Removing the Obstructions of 11 U.S.C. § 521(2)(A) and Ipso Facto Clauses,* 6 J. OF BANKR.L. & PRAC. 145 (1997). We recount that process in some detail here to demonstrate how the original 1981 proposal in fact became the 1984 amendment to section 521.

That the primary incentive for the changes ultimately enacted in section 521 was simply to ensure notice to creditors is amply supported by testimony from the 1981 hearings. For example, Alan O. Wiese, a representative of the creditor bankruptcy discussion group which first submitted the proposed additions to section 521, provided the following illustration:

> The bankruptcy is filed.... The creditor wonders what is going to happen to the

automobile; what happens to his collateral. Does he intend to return it.

> The debtor keeps on driving the automobile. He is making payments, but the creditor knows that once the discharge is granted he may or may not have an enforceable obligation or the debtor may or may not continue to pay for it.

> It is our perception that a great many of the adversary proceedings that are clogging the court system and literally creating chaos ... could be resolved if the debtor was made to undertake the responsibility of *giving creditors information before the first meeting of creditor, as to what they intend to do with the collateral.*

Hearing Before the Subcommittee on Courts of the Committee on the Judiciary, United States Senate, on the Bankruptcy Reform Act of 1978, 97th Cong., 1st Sess. 46 (1981) [hereinafter Senate Hearings]. Similarly, the American Retail Federation's representative complained of the automatic stay's proscription against contact with a debtor who continued to retain secured property. He suggested, "[a]t a very minimum, a creditor should be permitted to communicate with the debtor to determine whether the debtor is going to surrender the collateral or redeem it." *Id.* at 157 (prepared statement of Norman C. Grant); *see also id.* at 168 (prepared statement of Fred M. Hadden, general counsel of the National Association of Federal Credit Unions).

Perhaps the most complete description of the impetus for section 521 changes comes from the American Banker's Association representative, Walter W. Vaughan.:

97th Cong. 72 (1981) [hereinafter Senate Hearings].

**11.** These creditors are in a somewhat unique position relative to other secured creditors in a bankruptcy case. Exempt property is property of the bankruptcy estate by virtue of section 541, but is not administered by the bankruptcy trustee. The trustee might well abandon non-exempt property subject to a security interest at the first meeting of creditors—between 20 and 40 days after the bankruptcy filing. *See* FED.R.BANKR.P. 2003, BANKR.L.R. 6007. In any event, the trustee will return fully encumbered property in most instances to the secured creditor. *See* 11 U.S.C. § 725. Exempt property, on the other hand, is

retained by the debtor, leaving the creditor to speculate over its remedies. Should the creditor seek immediate relief from the automatic stay (at the cost of an additional filing fee)? If the debtor intends to reaffirm the debt, then perhaps such a motion is unnecessary. Yet the debtor does not have to make a decision on reaffirmation until the date of discharge, some 60 days following the first meeting of creditors, and some 90 days after the case has been filed. There is thus positive value to knowing what the debtor intends to do early in the case, and a statement of intention must now be filed within the first 30 days of the case. *See* FED.R.BANKR.P. 1007(b).

Often the debtor or the debtor's attorney will not communicate the debtor's intention with regard to secured property. The debtor will simply continue to use the property and the value of the property declines. The burden then falls upon the creditor to seek a resolution of the matter.

The remedies for this problem available to the creditor are not very attractive or cost efficient. The creditor may seek relief from the automatic stay by filing a $60 petition. This fee plus the time and expense of a hearing on the appropriate relief or adequate protection often makes this option cost prohibitive. Further, the outcome of the proceeding is far from certain. The court may determine that the stay should not be lifted and provide some sort of protection rather than having the property returned to the creditor.

. . . .

The Association believes that the automatic stay against seeking to recover secured property should expire automatically where the debtor declares an intention not to reaffirm or redeem secured property. Further, the debtor should have some reasonable time lim[i]t [sic] within which to reaffirm an obligation or to redeem to property. The automatic stay should be automatically lifted as to that property if the debtor does not declare an intention or fails to redeem or reaffirm within a specified time period.

These requirements will simply require the debtor to make certain decisions early in the proceeding on issues that must be resolved at some point in the proceeding.

Therefore, the debtor would have no additional burdens. However, the creditor will be relieved of significant burdens and will avoid unnecessary uncertainty and costs.

Senate Hearings, at 149.[12]

Subsequent to these hearings, the House and Senate introduced legislation to amend 521 to require the filing of a statement expressing the debtor's intention regarding consumer secured property. H.R. 4786, 97th Cong., 1st. Sess. § 8 (1981). The ultimate enactment now found in section 521(2)(A) is nearly a carbon copy of the original proposal offered by the bankruptcy discussion group.[13] Even the "if applicable" phrase in the current section 521(2)(A) was contained in the original proposed draft language. *Id.*; Nowka, at 155–56. As it turned out, that bill never passed the House and no report relating to it was ever issued. Nowka, at 156.

Soon after the 1981 hearings, a Senate bill, S.2000, was introduced which also called for an amendment to section 521. The language in this Senate bill also included the requirement for the filing of a statement of intention, as well as the "if applicable" language, and the requirement of timely performance by the debtor. S.2000, 97th Cong., 1st Sess. 6(b) (Dec. 16, 1981). Again in language that mirrored the bankruptcy discussion group's prepared statement, the Senate Judiciary Committee's report on S.2000 discussed the "inadequate mechanisms" that currently existed to protect secured creditors and proposed "notice" as a remedy to those problems. *Compare* S.Rep. No. 97–446, 97th

---

12. Like the lender representative that he was, Mr. Vaughan makes a strong, one-sided case for the creditor. He presumes that the creditor ought not have to be "victimized" by a debtor-friendly bankruptcy judge who might not lift the stay on demand, and presumes that the debtor will either redeem or reaffirm the debt. By the same token, however, he presumes that, if the debtor *fails* to surrender, or to reaffirm, or to redeem, then the lender ought to have immediate relief from the automatic stay. He does not suggest that the debtor would be compelled to redeem or to reaffirm either by the statute or by court order—only that the creditor would have recourse to its nonbankruptcy remedies in the event that none of these options were selected by the debtor (hopefully without the onus of having to file for relief from the automatic stay).

13. The proposed amendment provided:

if the debtor's schedule of assets and liabilities includes consumer debts which are secured by the property of the estate, file and serve, within ten days after the tiling the petition, upon each creditor holding such security and the trustee, a statement expressing the debtor's intention with respect to retention or surrender of the collateral and, if applicable, specifying that the collateral is claimed as exempt, that the debtor intends to redeem the collateral, or that the debtor intends to reaffirm debts secured by the collateral . . .

HR 4786, 97th Cong., 1st Sess. § 7 (1981).

Cong., 2d Sess. 16–18 (1981) *with* Senate Hearings, *supra* at 62–63. Nowka, in his article, suggests that it is far from a stretch to attribute the Senate's findings and conclusions in S.2000 to the bankruptcy discussion group. Nowka, at 156. The Senate took no action on S.2000, however, and the proposal lay dormant for the next year and a half or so.

S. 445, known as the Omnibus Bankruptcy Improvements Act of 1983, was introduced on February 3, 1983. This bill too contained proposed amendments to create a new subsection 521(2), using language identical to that proposed in S.2000 a year earlier. *Compare* S. 445, 98th Cong., 1st Sess. 207(a) (1983), *with* S.2000, 97th Cong., 2d Sess. § 7(a) (May 27, 1982). S. 445 was followed by a second bill, S. 1013, introduced in 1983. S. 1013, 98th Cong., 1st Sess. (May 4, 1983). Its provisions relating to section 521(2) were, unsurprisingly, identical to S. 445. Neither S. 445 nor S. 1013 moved in the Senate.

Meanwhile, the House also entertained a bill to amend the Bankruptcy Code in 1983. HR 1800, titled the Consumer Debtor Bankruptcy Amendments Act of 1983, tracked both S. 445 and S. 1013 with respect to an amendment to add a new section 521(2). H.R. 1800, 98th Cong., 1st Sess. 106 (1983); *see* Nowka, at 158. No vote was ever taken on HR 1800.

Finally, on March 21, 1984, the House debated H.R. 5174, the bill which ultimately *did* amend section 521 to add a new subsection (2) in its current form. H.R. 5174, 98th Cong., 2d Sess. (1984). The only floor discussion reported on section 521(2) involved a question to Congressman Rodino seeking an explanation of 521(2)(C). That subsection makes clear, stated Representative Rodino, that neither the debtor's nor the trustee's rights under the Bankruptcy Code to avoid liens, claim property as exempt, and the like would be affected by the new responsibility on the debtor to act promptly. 130 Cong. Rec. 6200, at 6204 (1984). No other enlightenment or explanation was sought or offered at that time. However, the substance of new section 521(2) as proposed in HR 5174 was essentially the same as the proposal first made by the bankruptcy discussion group in 1981.

Neither Representative Rodino nor any other member of Congress explained how the "if applicable" language provided by 521(2)(A) was intended to operate, nor did they address what the language was intended to mean. The legislative history thus offers us a less than satisfying source of information to aid us in solving our interpretive conundrum. Still, the entire saga of the insertion of section 521(2)(A) sheds some light into what Congress might have intended.

D. APPLICATION TO THIS MATTER

▪ Given the materials at hand, we must now decide which of the two tenable "reads" of the "if applicable" language in section 521(2)(A) best comports with Congress' intentions in enacting this provision. To reiterate, one reading, best laid out by the Eleventh Circuit in *Taylor*, is that the phrase "if applicable" refers to the precursor language in section 521(2)(A), forcing a debtor to choose between surrendering or retaining the property. If the property is to be retained, suggests this argument, then the subsequent language is "applicable" and the debtor is required to notify the creditor whether she is claiming the property as exempt, and whether she intends either to redeem the property or to reaffirm the secured debt. *See, e.g., Taylor*, at 1516.[14] The other

---

**14.** For the debtor in this case, the court's adoption of the first approach over the second would mean that the subsequent language would he "applicable" and, thus, the debtor would be required to first claim the property as exempt or not, and second, if the property is claimed as exempt, to then choose between the express option of redemption of the property and reaffirmation of the debt. If the property is not claimed as exempt, then of course, neither redemption nor reaffirmation would ·be relevant, because the property would be administered by the trustee in bankruptcy. If the debtor the court would then have to decide whether a motion to compel is the appropriate vehicle to resolve noncompliance. *See, e.g., Lowry*, 882 F.2d 1543 (10th Cir.1989); *In re Weir*, 173 B.R. 682 (Bankr.E.D.Cal.1994); *In re Tameling*, 173 B.R. 627 (Bankr.W.D.Mich. 1994). Secondly, if a motion to compel were appropriate, the court would have to force the debtor to choose one of the express options listed in section 521(2), meaning that the court would

reading, enunciated by the Fourth Circuit in *Belanger*, suggests that the precursor phrase ("the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property") expresses the mandatory duty of the debtor, and that the subsequent language following the phrase "if applicable" ("and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property") kicks in only if the debtor actually intends to employ one of those listed options. *See In re Belanger*, 962 F.2d at 347.[15] If the debtor does not intend to employ either redemption or reaffirmation, however, then the debtor would have no further duty beyond the plain statement that the debtor intends to retain or surrender the property.

We know from a review of the history behind the enactment of section 521(2)(A) that the proponents of the original change to section 521, members of the credit industry, testified to Congress that their proposal would function to ensure that creditors were on prompt *notice* of what a debtor intended to do with secured property. This information was essential, according to the industry representatives, because creditors found that getting correct information from debtor's attorneys was almost impossible and, in *pro se* cases, creditors were not even allowed to contact the debtor to obtain such information. *See* text *supra.* Nothing in that testimony—or, for that matter, in any other relevant legislative history—suggests that the credit industry was proposing changes to *compel* debtors to choose one of the two express options now housed in section 521(2) if they intended to keep the property and claim it as exempt. The primary concern expressed by the credit industry was for prompt information, coupled with an assurance that the debtor would act promptly on whatever choices she had elected, so that the

creditor would know what its options were and could act accordingly. True enough, a spokesman for the American Bankers' Association sought an additional remedy—automatic relief from the stay in the event the debtor chose both to retain and neither to redeem nor to reaffirm. Congress declined to enact that suggestion however, and no such remedy was incorporated in either section 521 or section 362. A review of this history viewed in conjunction with the statute ultimately enacted by Congress, seems to confirm that Congress was ready to take the credit industry at its word that the essential need was information, and that creditors already had adequate devices at their disposal (such as seeking relief from the stay) to take appropriate action to protect themselves once they had that information in hand.

This legislative background suggests that the better "read" of the statute is one which treats the section as essentially procedural, intended to afford consumer creditors with liens on exempt consumer property certain relevant information on the status of their secured property, so that they could take appropriate steps to protect their interests. This interpretation is bolstered by the fact that section 521 fails to provide a court with any means with which to force a debtor to make any particular selection. *See In re Weir*, 173 B.R. 682 (Bankr.E.D.Cal.1994); *In re Tameling*, 173 B.R. 627 (Bankr.W.D.Mich. 1994); *but see In re Chavarria*, 117 B.R. 582 (Bankr.D.Idaho 1990); *In re Kennedy*, 137 B.R. 302 (Bankr.E.D.Ark.1992). In application, this means that the *Belanger* interpretation of section 521(2)(A), which reads the statute to require the debtor to tell the creditor whether she intends to surrender the property or to keep it, and if she intends to keep it, whether she intends to employ the options of reaffirmation or redemption that the Code affords debtors, without presuming to force the debtor into selecting only out of those two option, seems the most appropri-

have to settle on an appropriate enforcement mechanism in the event of noncompliance. The statute itself, of course, is silent on this point.

**15.** If this court were to adopt the second approach to interpreting the statute, the debtor would be required to formally indicate whether the property was being retained or surrendered. Having satisfied that first requirement here—to

wit, having indicated that the property was to be retained via an "informal reaffirmation"—this approach would not require the debtor to indicate whether the property was claimed as exempt, or whether the debtor intended to retain the property or reaffirm the debt because these options are not "applicable" in this instance. Thus, the motion to compel would be denied.

ate, and most consistent with what appears to have been Congress' intent. If the debtor elects to retain, and discloses no intent to either redeem or reaffirm, then creditors know that they may need to seek relief from the stay promptly, and the statute will have done its job of alerting the creditor regarding the status and disposition of its collateral so that the creditor can respond.

The *Belanger* approach is also supported by a review of subparagraph (C) of section 521(2). It states: "nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title." 11 U.S.C. § 521(2)(C). As noted by Judge James Queenan in *In re Ogando*, 203 B.R. 14 (Bankr.D.Mass.1996), restricting the debtors retention options to redemption "indisputably *does* 'alter' the debtors 'rights.'" *Id.* at 16 (emphasis added). Only if the phrase "if applicable" leaves open other options, Judge Queenan explains, can a debtor

> retain the collateral and continue to make the contract payments or go into default and risk foreclosure. Amazingly, courts restricting the debtor to redemption or reaffirmation refer not at all to subparagraph (C). Yet its meaning is plain, especially in light of its location in a statute whose other paragraphs all relate to procedure and not substance.

*Id.*

Perhaps even more convincing support for the *Belanger* interpretation can be found in

the general framework that Congress established to protect debtors from entering into improvident reaffirmation agreements. Section 524(c) mandates that a reaffirmation agreement contain, among other items, a "clear and conspicuous statement which advises the debtor that such agreement is not required." 11 U.S.C. § 524(c)(2)(B). If section 521(2)(A) is read to *impose* reaffirmation upon the debtor who wishes to retain the property, we in effect convert so-called "voluntary" reaffirmation into a statutory requirement. *See In re Harper*, 143 B.R. 682, 685 (Bankr.W.D.Tex.1992). As the Fourth Circuit noted in *In re Belanger*, "[t]his enables the creditor to compel the debtor to meet the creditor's terms of reaffirmation or to surrender the property." 962 F.2d at 348. Such an imposition renders illusory the protections afforded the debtor by section 524(c), including the right to a determination by her attorney that the debtor's reaffirmation agreement is "voluntary." 11 U.S.C. § 524(c)(3)(A); *see also In re Harper*, at 685, *In re Ogando*, at 16.[16] It would be an odd reading indeed to suggest that Congress intended to undercut, by its enactment of section 521(2)(A), the many protections against involuntary reaffirmation Congress had built into section 524(c).[17]

The *Belanger* approach also comports more naturally with the general structure of chapter seven, which is to accord a discharge of *all* unsecured claims against the debtor.

**16.** Alternatively, the so-called "requirement" can easily be rendered nearly laughable because Code-sanctioned reaffirmations contain a 60 day "cooling off" period, within which time a debtor may elect to repudiate the reaffirmation agreement without penalty. *See* 11 U.S.C. § 524(c)(2)(A). A debtor might thus simply state an intention to reaffirm, in fact enter into a reaffirmation agreement, then repudiate the agreement, leaving the creditor no better off than it would have been had no reaffirmation agreement ever been executed in the first place. At most, the creditor might then elect to pursue repossession and sale of the collateral on grounds that the reaffirmation agreement had been "breached," but the argument would be thin indeed, given the Code's express provision authorizing such a rescission. Nor would the creditor lightly dare to claim continued enforceability of the rescinded reaffirmation agreement, in light of the recent experiences of Sears with its practice of obtaining and enforcing non-court-

approved reaffirmation agreements. *See* "Sears to Refund Reaffirmation Payments" Consumer Bankruptcy News, Vol. 6, Issue 15, at page 1 (LRP Productions, April 24, 1997). The creditor would thus be limited to the very claims that it can now urge when a debtor who does not reaffirm and retains the collateral while maintaining payments, namely, arguing that bankruptcy itself is an event of default under its loan documents, authorizing it to repossess and sell the collateral. In both situations, of course, whatever deficiency claims it might have would be discharged.

**17.** A similar observation may be made with respect to section 722, which offers the debtor the *opportunity*, but not the *obligation*, to redeem certain exempt personal property. 11 U.S.C. § 722 ("an individual debtor *may* ... redeem tangible personal property ...") (emphasis added).

*See* 11 U.S.C. § 524, 506(a). Even the Supreme Court's decision in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) does not counsel a different result, for that Court held only that section 506(d) could not be read to "strip down" a creditor's undersecured lien on *real* property claimed exempt by the debtor. The case did not address similar claims on exempt *personal* property, but to the extent that its logic should apply to exempt personalty, we need not further torture section 521(2)(A), because *Dewsnup* would accomplish that result solely based on its reading of section 506(d), and reaffirmation would be unnecessary to assure its protection.

Our review of the critiques of a possible four-method approach have not convinced us otherwise. For example, the *Taylor* court recognized that reading section 521(2) as a whole requires us to pay particular attention to subsection (2)(B). That subsection, in turn, requires that the debtor perform her intention stated in subsection (A) within forty-five days after the filing of the statement, or within such additional time as the court, for cause, fixes. Because, "perform" suggests fulfill, carry out or complete, the court opined in *Taylor* that "[a]n option to retain and keep current is not an act capable of performance within forty-five days." *Taylor*, 3 F.3d at 1516. Although we recognize the facial credibility of this observation, it does not compel accepting *Taylor*'s interpretation of section 521(2)(A).

At least two alternative readings of subsection (B) commend themselves. One is that the reference in that subsection to the "intention with respect to such property, *as specified by subparagraph (A)*" refers only to those intentions which are expressly specified in that subsection, namely, reaffirmation or redemption, and imposes no similar time deadline for other intentions not specifically specified in subparagraph (A), such as retention without redemption or reaffirmation. The other reading is that retention coupled with continued performance on the loan obligation *is* an intention which can be performed within 45 days—the debtor can continue to make the payments as called for under the loan agreement, at least one of

which is likely to become due within that 45 day period. Because the property is exempt, and because the *next* payment will likely be due at a point *after* the debtor's discharge, the creditor has a ready remedy in the event of a subsequent default in continued performance—it can simply repossess the collateral and pursue its nonbankruptcy remedies, unimpeded by the automatic stay, which expires as to the debtor and its exempt property upon the entry of the debtor's discharge. *See* 11 U.S.C. § 362(c). That reading, again, comports with what we believe to have been Congress' primary intentions in enacting section 521(2)(A)—to afford the creditor notice of what the debtor's intentions are with respect to the collateral so that the creditor can take appropriate steps to protect its interests.

In spite of all the foregoing, we do not mean to suggest that the *Belanger* approach is free from criticism. In fact, we admit to making this decision in the face of two tenable reads of the statute, neither of which is clearly right. Nevertheless, we can find fault with a majority of the opinions that have addressed this issue because they fail to analyze the issue at all. Instead, they simply divide the applicable circuit case law into two strands, those that find that a fourth option is available under 521(2) and those that find a fourth option is not available, and pick a strand that they find "convincing." This "results-oriented" approach simply glosses over the fact that each circuit court reached its own result based largely on unique reasoning. To the extent such courts are not simply making their own visceral determinations, taking such an *ad hoc* approach replaces sound analysis with mere citation counting. Such a methodology, to the extent it can even be called such, ignores the facts of a particular case, and appears to be results driven. A disciplined approach to statutory construction demands that we eschew results-driven analyses. We have attempted to be disciplined in the analysis we have employed in this case.

In sum, we find the legislative history to be persuasive, strongly suggesting that the statute was created simply to ensure that the creditor be informed of the debtor's intent.

Had the credit industry desired their provision to serve a greater role than that of notice, it would seem that they would have provided a draft which included a means of ready enforcement for Congress. This they did not do, and even if they had, Congress elected not to enact it.

 In the present instance, we can give meaning to all the words Congress used in the statute while ensuring that the Congress' intent is preserved. That intent can be gleaned from the legislative history suggesting not that Congress sought to tie debtors' hands, but rather that, at the urging of the consumer creditors' lobby, they sought to provide a channel of communication between debtors and creditors—a channel that might enable debtors and creditors to work together, to avoid unnecessary litigation, and ultimately, to get creditors paid. We also adopt the approach that affords due deference to the statutory requirements for reaffirmation agreements. Accordingly, we join a majority of bankruptcy courts, *see, e.g., In re Ogando,* 203 B.R. 14, *In re Doss,* 203 B.R. 57, *Capital Comm. Fed. Credit Union v. Boodrow,* 197 B.R. 409 (N.D.N.Y.1996); *In re Parlato,* 185 B.R. 413 (Bankr.D.Conn.1995); *First Nat'l Bank of Union Co. v. Shubert (In re Shubert),* 147 B.R. 618 (Bankr.N.D.Ga.1992), the Fourth Circuit, *see In re Belanger, and Colliers, see* 3 COLLIER ON BANKRUPTCY ¶ 521.09A[2] (1996) ("[n]othing in section 521(2) requires the debtor to choose redemption, reaffirmation or surrender of the property to the exclusion of all other alternatives although no other alternatives are provided for in the Code. That section merely requires a statement of whether the debtor intends to choose any of those options, *if applicable.* "), and find that section 521(2)(A) is essentially a notice statute, mandating an early disclosure of the debtor's intentions with respect to secured creditors that does not enlarge or improve the substantive rights of said creditors.

Finally, despite the Credit Union's suggestion to the contrary, we find that this decision does not conflict with the Fifth Circuit's adoption of the bankruptcy court decision in *Johnson v. Sun Finance Co. (In re Johnson),* 89 F.3d 249 (1996). That decision simply held that a debtor who made no indication as to intent—the debtor there marked "N/A" on the Statement of Intention Form—could not continue to retain secured property. *Id.* at 251. But no one here disputes that the debtor *must* indicate what she intends to do with the property and make good on that intention within 45 days of his statement. *See* §§ 521(2)(A) & (2)(B). (That, in fact, was never even disputed in any of the four circuit court opinions.) As the legislative history makes clear, that was the exact purpose that the amendments to section 521 were to serve—notification of the debtor's intent. Because we have notification and performance, the *Johnson* decision is not applicable to the facts before us.

### Conclusion

 Pursuant to the foregoing, the court finds a fourth alternative, to wit, notice of intent to continue to make timely payments on secured property and subsequent performance of that intent within 45 days, *see* 11 U.S.C. §§ 521(2)(A) and (2)(B), will satisfy the notice requirements of section 521(2)(A). 11 U.S.C. § 521(2)(A). Accordingly, the court finds that the debtor does not automatically violate the terms of the contract by intending to perform in a manner that is not expressly stated in section 521. To the extent, however, that an *ipso facto* clause exists which the creditors are attempting to enforce, the court finds that the prohibition on the enforcement of such clauses found in section 365 applies only to executory contracts—not to purchase money contracts—and, thus, that the creditor is free to seek recourse accordingly under the terms of its agreement and applicable state law.[18]

---

**18.** *See* 11 U.S.C. §§ 365(b)(2)(B), (e)(1)(B). Indeed, our holding regarding the proper reading of section 521(2)(A) all but mandates this conclusion. A creditor advised of the debtor's intention to retain property and maintain current payments may well deem itself sufficiently insecure by the mere fact that the debtor has filed bankruptcy to seek relief from the stay during the course of the case itself, alleging a lack of adequate protection of its interests, or alternatively, to await the automatic expiration of the stay upon the debtor's discharge to then seek recovery of its collateral under state law. We offer here no opinion regarding whether state law

A form of judgment consistent with this decision shall be entered on even date.

would in fact afford a creditor any remedy when the debtor is current on its payments, as that issue is not before us (nor is it likely to be presented in any bankruptcy case). The creditor who believes itself to be at risk in such a situation will not, of course, be able to force any sort of post-discharge "reaffirmation" of the discharged deficiency claim, but that is an unremarkable outcome, given that *all* unsecured creditors (and an undersecured creditor is unsecured *vis-a-vis* its deficiency claim) are similarly constrained by the fact of discharge.